```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF IOWA
2                       DAVENPORT DIVISION


3


4   UNITED STATES OF AMERICA,    )
                                 )
5            Plaintiff,          )
                                 )
6                                ) Criminal No. 3:11-MJ-19
        vs.                      )
7                                ) DETENTION HEARING
    BRIAN REYNOLDS,              )
8                                )
             Defendant.          )
9


10


11


12       The above-entitled matter came on for hearing on
    Wednesday, April 6, 2011, at 1:11 p.m., at the Davenport
13  Federal Building, 131 East Fourth Street, Davenport, Iowa,
    before the Honorable Thomas J. Shields, Judge of the United
14  States District Court, Southern District of Iowa.


15


16                       APPEARANCES:

17  CLIFFORD R. CRONK, III, Assistant United States Attorney, U.S.
    Attorney's Office, Southern District of Iowa, Davenport
18  Federal Building, Third Floor, 131 East Fourth Street,
    Davenport, Iowa 52801, appearing for the United States of
19  America.

20
    DIANE Z. HELPHREY, Assistant Federal Defender, Federal Public
21  Defender's Office, 101 West Second Street, Suite 401,
    Davenport, Iowa 52801, appearing on behalf of the Defendant.
22


23                  Heidi Krafka, CSR, RMR
24                     Weston Reporting
                        P.O. Box 393
25                 Bettendorf, Iowa 52722
                     (563) 355-8400
```

1                           I N D E X

2    Witness              DIRECT   CROSS   REDIRECT   RECROSS

3    James McMillan          3       7      14, 16    16, 17

4

5

6

7                    P R O C E E D I N G S

8               THE COURT:  Please be seated.  Good afternoon,

9    Everyone.

10              MR. CRONK:  Good afternoon, Your Honor.

11              THE COURT:  Sorry for the delay.  We are in

12   open court.  We are on the record in the matter of United

13   States of America versus Brian Reynolds.  This is Case

14   No. 3:11-MJ-19.  We are here for preliminary hearing pursuant

15   to Rule 5 and Rule 5.1 of the Federal Rules of Criminal

16   Procedure and bond or detention hearing pursuant to 18 United

17   States Code Section 3142.  Mr. Cronk, is the Government ready

18   to proceed?

19              MR. CRONK:  The Government is ready.

20              THE COURT:  Ms. Helphrey, are you and

21   Mr. Reynolds ready to proceed?

22              MS. HELPHREY:  Yes, we are, Your Honor.

23              THE COURT:  Mr. Cronk?

24              MR. CRONK:  Your Honor, we intend to call Jim

25   McMillan and no other witnesses.

1        THE COURT:  All right.  Agent McMillan, come

2   forward and be sworn, please.

3               JAMES McMILLAN,

4   was called as a witness and, having first been duly sworn to

5   testify the truth, the whole truth, and nothing but the truth,

6   was examined and testified as follows:

7        THE CLERK:  Thank you.  Please have a seat in

8   the witness chair.

9               DIRECT EXAMINATION

10  BY MR. CRONK:

11       Q.  Would you state your name and spell your spell your

12  last name, please.

13       A.  James McMillan, M-C-M-I-L-L-A-N.

14       Q.  Please tell us your occupation.

15       A.  Special agent with the Federal Bureau of

16  Investigation.

17       Q.  Tell us how long you've been a law enforcement

18  officer.

19       A.  I've been with the FBI for approximately nine years.

20       Q.  And did you have law enforcement experience prior to

21  that?

22       A.  For approximately two years before that I was a fraud

23  investigator with the United States Postal Inspection Service.

24       Q.  Tell us, are you familiar with Brian Reynolds?

25       A.  I am.

1    Q.  And do you see him here today?

2    A.  I do.

3    Q.  Would you point to him, tell us where he's seated,

4  what he's wearing so we know exactly who you're referring to.

5    A.  He's sitting at the defendant's table next to

6  Miss Helphrey wearing an orange jumpsuit.

7         MR. CRONK:  The record should reflect the

8  witness has identified the defendant.

9         THE COURT:  The record will so reflect that

10  identification.

11         MR. CRONK:  Thank you.

12  BY MR. CRONK:

13    Q.  Special Agent McMillan, did you have occasion to

14  investigate Mr. Reynolds, or are you investigating

15  Mr. Reynolds presently?

16    A.  Yes, I am.

17    Q.  And can you tell us, are you the individual that

18  swore to the affidavit in support of the complaint and arrest

19  warrants in this case?

20    A.  I am.

21    Q.  Upon review of that affidavit, have you found

22  anything in it that's not true?

23    A.  No.

24    Q.  Can you tell us, have you -- besides the information

25  contained in this affidavit, have you had a chance to review

1  the criminal history that was part of the Pretrial Services

2  Report?

3       A.  Yes, I have.

4       Q.  Did you see anything that you believe should be there

5  that's missing?

6       A.  Yes.  There's one entry that we discovered on his

7  criminal history that is not in the report.

8       Q.  And when was that roughly?

9       A.  That was in 2004 in Muscatine.

10      Q.  And what was the crime he was arrested for?

11      A.  Lascivious acts with a minor.

12      Q.  Have you had an opportunity to interview the person

13  who alleged lascivious acts by the defendant in 2004?

14      A.  Yes, I have.

15      Q.  How old was the person who made these allegations

16  when the crime -- when the allegations arose?

17      A.  At the time the allegations were made, the person was

18  12 years old.  At the time of the offense, she would have been

19  10 years old.

20      Q.  And tell us how old the reporter is now.

21      A.  She's an adult now.  She's either 18 or 19.

22      Q.  And have you spoken with her?

23      A.  Yes, I have.

24      Q.  Would you describe to the judge what this person said

25  Mr. Reynolds did to her when she was roughly 11 years old?

1          MS. HELPHREY:  Your Honor, I guess at this

2    point I'm going to object.  There's nothing in the record

3    indicating that there was any type of conviction in this

4    matter.  As I understand it, there may not have been.  In

5    fact, I would like to see whether or not there has been a

6    conviction.

7          THE COURT:  Well, you can lay some foundation

8    in regard to what transpired, and then I'll determine whether

9    we'll hear the testimony.

10          MR. CRONK:  If -- I can state for the Court as

11    far as I know those charges were not pursued.

12          THE COURT:  All right.

13          MR. CRONK:  Nevertheless, the victim was

14    interviewed, and we think it's relevant to detention.

15          MS. HELPHREY:  Your Honor, I would argue that

16    it's irrelevant if there hasn't been a conviction.  Obviously

17    there's no indication of reliability regarding this interview

18    and why it wasn't pursued.  This is obviously hearsay evidence

19    which is allowable, but it still has to have some indicia for

20    liability to be probative to a detention matter.

21          THE COURT:  Well, I think the reliability will

22    be determined by Agent McMillan's testimony, because it goes

23    to character at this point.  I'll hear the testimony.

24          MR. CRONK:  Thank you.

25    BY MR. CRONK:

1    Q.  When did you interview roughly this person?

2    A.  Within the past two weeks.

3    Q.  Would you give us a description -- You don't have to

4  go into great detail, but give us a description of what the

5  person told you.

6    A.  The person told me that she and Brian Reynolds were

7  staying overnight at the same residence, that around bedtime

8  Mr. Reynolds climbed into bed with her, partially disrobed

9  her, touched her vagina with his finger, also touched her

10  vagina with his penis.  He masturbated in front of her.  He

11  also had her manually stimulate his penis with her hand, and

12  he ultimately ejaculated.

13    Q.  When she told you these things, was she able to give

14  you sufficient detail for you to assess whether it appeared

15  that this was -- Well, were there circumstances that caused

16  you to believe her?

17    A.  Yes.

18    Q.  And did you believe her?

19    A.  I did.

20              MR. CRONK:  That's all I have, Your Honor.

21              THE COURT:  Cross-examine, Ms. Helphrey?

22              MS. HELPHREY:  Thank you.

23                    CROSS-EXAMINATION

24  BY MS. HELPHREY:

25    Q.  Just to clarify the testimony regarding this

1   interview you just spoke of, you talked about interviewing the

2   individual that reported the allegations concerning the

3   lascivious acts recently; is that correct?

4       A.  Yes.

5       Q.  Approximately two weeks ago?

6       A.  Within the past two weeks.  I don't recall the exact

7   date.

8       Q.  And how long ago did the alleged incident get

9   reported?

10      A.  It was reported in 2004.

11      Q.  So roughly seven years ago?

12      A.  Yes.

13      Q.  So the interview was concerning a matter that

14  happened seven years ago in the past; correct?

15      A.  Yes.

16      Q.  And with regard to the reports seven years ago, were

17  these same details outlined in any police reports?

18      A.  Some of the details were.

19      Q.  Which of the details?

20      A.  The reports that Mr. Reynolds had climbed into bed

21  and sexually molested this victim.

22      Q.  In what manner?

23      A.  In the manner I've described.

24      Q.  It was consistent with the interview that you just

25  had two weeks ago, the details were consistent?

1    A.  I can't speak to every minute detail of it, but

2  generally it was consistent, yes.

3    Q.  And with regard to that 2004 matter, there was a

4  decision not to pursue or prosecute it; is that correct?

5    A.  I believe that the charges were ultimately dismissed.

6    Q.  Now, with regard to the current allegations, they

7  involve an investigation commencing February 1st of 2009; is

8  that correct?

9    A.  Yes.

10    Q.  And on February 1st, 2009, a party reported the

11  alleged contact by Mr. Reynolds to have occurred January 30th

12  of 2009; is that correct?

13    A.  Yes.

14    Q.  So with regard to the alleged contact, it was roughly

15  two days before anyone reported it to law enforcement; is that

16  correct?

17    A.  I would have to look at the records, but that could

18  be the case, yeah.

19    Q.  And when it was reported, it was not reported by the

20  minor that was allegedly involved in the contact; is that

21  correct?

22    A.  That's right.

23    Q.  There was a third party that reported this?

24    A.  Yes.

25    Q.  And once it was reported, you indicated the

1    investigation commenced.  As part of your investigation, at

2    some point did you interview Mr. Reynolds?

3         A.  Yes.

4         Q.  And he actually participated in an interview on a

5    voluntary basis; is that correct?

6         A.  Yes.  After we arrested him, yes.

7         Q.  And you told him that he didn't have to talk to you

8    if he didn't want to; correct?

9         A.  Yes.  He was advised of his rights, and he waived

10   them.

11        Q.  Now, with regard to that interview, you talked to him

12   about alleged contact with a minor; is that correct?

13        A.  Yes.

14        Q.  And he denied any contact with that individual; is

15   that also correct?

16        A.  Well, he would never say what individual we were

17   talking about.

18        Q.  But you told him -- Well, let me ask:  How old was

19   the person?  Was it a 13-year-old that was alleged to have

20   contact with Mr. Reynolds?

21        A.  Yes.

22        Q.  And you asked him if he had had any kind of contact

23   with a 13-year-old; is that fair to say?

24        A.  Yes.

25        Q.  And he said no; is that correct?

1    A.  Yes.

2    Q.  And you asked him if he had had any online chats with

3  a 13-year-old; is that correct?

4    A.  I don't know if I asked that exact question, but in

5  the spirit of that, yes.

6    Q.  And he indicated he had not knowingly communicated

7  with anyone that was 13 years of age; is that fair to say?

8    A.  Yes.

9    Q.  And with respect to any discussions that he had had,

10  he indicated that it would have been with individuals that had

11  represented themselves as adults; is that fair to say?

12    A.  That's not the way he characterized it, no.

13    Q.  How did he characterize it?

14    A.  He said that someone could be underage but appear

15  much older, not necessarily that they were intentionally

16  misrepresenting their age.

17    Q.  So at no time did he indicate that someone had

18  communicated being a minor and he continued having any kind of

19  sexual conversation?

20    A.  I don't know if we addressed that specifically.

21    Q.  But nothing of the interview presented a statement of

22  that kind?

23    A.  Yeah, he denied having contact with minors if that's

24  what you're getting at.

25    Q.  Okay.  And with respect to the forensics evaluation

 1  of the computer, I know you indicated in the affidavit that

 2  there were photos found on the computer that represented the

 3  minor involved; is that correct?

 4      A.  Are you talking about the minor victim?

 5      Q.  Yes, the minor that alleged -- was alleged to have

 6  contact with Mr. Reynolds.

 7      A.  Yes, we found pictures of her on his computer.

 8      Q.  And with regard to those pictures, they were not part

 9  of any identifying chat or context that said the person was 13

10  or a minor; is that fair to say?

11      A.  Yes.

12      Q.  Were there any chats that indicated I'm 13 years old

13  and you saw Mr. Reynolds continuing a conversation in the

14  forensics evaluation?

15      A.  Not that I've seen.

16      Q.  Now, with respect to his arrest, you indicated that

17  he provided a statement once he was taken into custody;

18  correct?

19      A.  Yes.

20      Q.  Was he cooperative with the process of being taken

21  into custody, being handcuffed and so forth?

22      A.  Yes, but he doesn't follow directions well.  He was

23  somewhat resistant to our instructions.

24      Q.  Did he in any way physically resist the arrest?

25      A.  No.

1      Q.  Or try to escape or evade the officers?

2      A.  No.

3      Q.  I know there's also reference in the affidavit about

4  clothing that the alleged victim was wearing when this contact

5  was alleged to have occurred.  Was there an analysis done of

6  that clothing?

7              MR. CRONK:  Objection.  This is not a discovery

8  hearing.

9              THE COURT:  Sustained.

10             MS. HELPHREY:  I think it would -- if I could

11  be heard briefly.

12             THE COURT:  All right.

13             MS. HELPHREY:  I think it would be relevant

14  obviously to the strength of evidence if, in fact, there was

15  scientific evidence versus not scientific evidence, so I think

16  it's pertinent --

17             THE COURT:  Okay.  I'll give you some leeway.

18  I'll allow the question.

19  BY MS. HELPHREY:

20     Q.  Was there any analysis done of the clothing that was

21  taken in regard to the alleged contact?

22     A.  There was analysis of clothing.

23     Q.  Was there any forensics evaluation that connected

24  Mr. Reynolds to that clothing?

25     A.  No.

 1           MS. HELPHREY:  I have nothing further.  Thank
 2  you.
 3           THE COURT:  Redirect, Mr. Cronk?
 4           MR. CRONK:  Thank you.
 5                    REDIRECT EXAMINATION
 6  BY MR. CRONK:
 7      Q.  Let's go to the question about it being a two-day
 8  time period between the incident and the reporting of the
 9  incident.  Can we go back to that point?
10      A.  Yes.
11      Q.  What time of day on January 30th was this alleged to
12  have occurred?
13      A.  Approximately between the hours of 9 and 11 p.m. or 9
14  to midnight.
15      Q.  And you've done -- or you've had a forensic
16  examination done of Mr. Reynolds' computer.  Did anything
17  unusual happen shortly after 11:00 on the night of this
18  incident?
19      A.  Yes.
20      Q.  What was that?
21      A.  During the forensic examination of his computer a
22  deleted folder was discovered by our examiners, and it was
23  labeled with the Yahoo! user ID of the minor victim.
24      Q.  Indicating what?
25      A.  Indicating that there were chat logs in that folder

1    maintained on Mr. Reynolds' computer.

2         Q.   And when were they deleted?

3         A.   They were deleted at approximately 11:30 p.m. on

4    January 30th, 2009.

5         Q.   Meaning that they were deleted sometime or shortly

6    after the allegations made by the victim; in other words, the

7    incident occurred, and after the incident someone deleted the

8    chat file for this particular victim on Mr. Reynolds'

9    computer?

10        A.   Yes.

11        Q.   Is it fair to say that the person who reported this

12   incident to the police learned about it the day after it

13   happened or roughly 24 hours after it happened?

14        A.   Yes.

15        Q.   And so the police responded in less than two days to

16   the allegations?

17        A.   Yes.

18        Q.   Let's go to the point of arrest in this case.  How

19   many officers were with you when you were with Mr. Reynolds?

20        A.   Three others.

21        Q.   So he chose not to resist three law enforcement

22   officers that were within arm's reach of him?

23        A.   Four total including me, yes.

24        Q.   He told you that he hasn't had any online chats with

25   minors?

1      A.  Yes.

2      Q.  Do you believe that?

3      A.  No.

4      Q.  Do you have evidence to the contrary?

5      A.  I do.

6      Q.  A lot?

7      A.  Yes.

8             MR. CRONK:  That's all, Your Honor.

9             THE COURT:  Recross-Ms. Helphrey?

10                 RECROSS-EXAMINATION

11  BY MS. HELPHREY:

12     Q.  Let me clarify, Agent McMillan.  When you say no

13  chats with minors, did Mr. Reynolds deny having any sexual

14  chats with minors?

15     A.  I don't recall that we differentiated that

16  specifically.

17     Q.  Were there any sexual chats with minors found in the

18  forensics evaluation?

19     A.  Of his computer?

20     Q.  Yes.

21     A.  No.

22             MS. HELPHREY:  I have nothing else.  Thank you.

23             MR. CRONK:  I do.

24                 REDIRECT EXAMINATION

25  BY MR. CRONK:

1    Q.  Has he been using a different computer since he's

2  been in jail?

3    A.  Yes.

4    Q.  Which computers have you identified to him, if you

5  can tell us?

6    A.  By all indications, and we're still waiting on a

7  response to legal service, but it appears that he used at

8  least one computer at one of his employers and the computer at

9  the Davenport Public Library.  We also identified that he was

10  in possession of a cell phone at the halfway house and

11  accessed the internet through that.

12    Q.  And the cell phone, that was against the rules is my

13  understanding?

14    A.  Yes.

15    Q.  And so his phone was confiscated?

16    A.  Yes.

17              MR. CRONK:  That's all, Your Honor.

18              THE COURT:  Miss Helphrey?

19                   RECROSS-EXAMINATION

20  BY MS. HELPHREY:

21    Q.  Just briefly.  With respect to the content that

22  you're talking about with computer contact and cell phone

23  contact, there was no sexual contact with a minor in any of

24  those devices; is that correct?

25    A.  In -- In this most recent activity that Mr. Cronk and

1  I were just talking about?

2      Q.  Yes.

3      A.  No, I wouldn't say that.  I mean, I disagree with

4  you.  Yes, there was sexually-themed discussions with minors

5  in that evidence that we found.

6      Q.  And which medium was that found in?

7              MR. CRONK:  Objection.  Discovery, Your Honor.

8              THE COURT:  Overruled.

9      A.  This was found during the execution of a search

10 warrant on his Facebook account.

11     Q.  And with regard to that content, is there any way of

12 identifying that it was him on his Facebook account?

13     A.  We don't know that for certain at this point, but

14 we're still investigating that.

15             MS. HELPHREY:  I have nothing else.  Thank you.

16             MR. CRONK:  That's all, Your Honor.

17             THE COURT:  Thank you, Agent McMillan.  You may

18 step down.

19             THE WITNESS:  Thank you, Judge.

20             THE COURT:  Miss Helphrey, any witnesses you

21 wish to call?

22             MS. HELPHREY:  Your Honor, I do not have

23 witnesses to present at this time.  However, I do have

24 information to provide by way of proffer.  I would just

25 indicate that we did make contact with Mr. Reynolds' brother.

1    I know Mr. Reynolds was staying at the halfway house.

2    Certainly he can go -- if the Court authorizes him to go back

3    there, that is one viable option.  If the Court feels based on

4    what's in the Pretrial Services Report that he cannot go back

5    to the halfway house, we have confirmed that his brother, Brad

6    Reynolds, would be willing to take him into his home.  He

7    lives in Muscatine.  We did provide that information to the

8    Pretrial Services writer for any type of confirmation that

9    would be necessary.  It is referenced in the report.  So we

10   just wanted to make the Court aware that he would be available

11   for a placement option.

12                  THE COURT:  Mr. Cronk?

13                  MR. CRONK:  There's probable cause to believe

14   the defendant committed the two serious crimes in this

15   complaint, Your Honor.  There's also extensive evidence that

16   the defendant poses a danger to the community.  He is

17   essentially unsupervisable.  If he can't survive successfully

18   in a halfway house, it is highly unlikely that he will abide

19   by any conditions that the Court would set while staying at

20   his brother's who I believe is employed.  This man poses an

21   extreme danger to the community.

22                  THE COURT:  Ms. Helphrey?

23                  MS. HELPHREY:  Thank you, Your Honor.  We are

24   asking the Court to consider release in this case.  Obviously

25   Mr. Reynolds was placed at the halfway house.  They had not

1  prior to his arrest in any way terminated his placement or

2  asked for any kind of revocation of his placement at the

3  halfway house.  He was, in fact, in an active placement there.

4  With regard to whether or not Mr. Reynolds presents any type

5  of risk of flight or danger to the community, obviously the

6  first thing I would point out to the Court is what is before

7  the Court right now is simply a form of allegation.

8  Mr. Reynolds is presumed innocent of the charges that are --

9  or the allegations that are alleged in the criminal complaint

10  at this point.  With regard to his other criminal history, I

11  would indicate I do not believe that it would suggest he could

12  not be monitored in the community.  Although there are a

13  number of contacts, I understand, in the report, if you will

14  notice, a number of the contacts in the report other than the

15  last few are ten years of age or older.  As you also noticed,

16  there's no allegation here of any kind of bond violation,

17  warrant for failure to appear, so of all the contacts, there's

18  no indication of any failure to appear for any type of court

19  matter.

20          With regard to Mr. Reynolds' connection to the

21  community, quite honestly there's no realistic expectation

22  that he would have anywhere to run to.  He was born in

23  Muscatine and has remained in this area for the entirety of

24  his life.  He has a strong work history as outlined in the

25  Pretrial Services Report.  He was working for the past most

1   recent time at Bruce Enterprises.  Prior to that he was at

2   Greystone Manufacturing for six months, and then it reports

3   ExpertTire for a period of six years, which is obviously long

4   and steady employment.

5           With regard to his criminal history as well, I would

6   note there certainly is no type of entry that we might

7   commonly see such as a weapons charge or something of that

8   nature that would indicate a risk to the community.  What

9   we're asking Court to do is to release Mr. Reynolds.

10  Primarily we're asking for release back to the halfway house

11  to the surroundings that he was in.  We believe that provides

12  direct monitoring by the professional staff, it provides a

13  communication from Pretrial Services to that staff, and

14  obviously a stable environment.  It would also allow

15  Mr. Reynolds to continue with employment, so primarily we're

16  asking that he return to the residence he has most recently

17  had.  However, if the Court is concerned with the violations

18  that are alleged or reported in the Pretrial Services

19  Report -- they obviously haven't resulted in any type of

20  expulsion from the halfway house, but if, in fact, the Court

21  is reluctant to order him back to that placement, we're asking

22  the Court to consider placement with his brother with any

23  conditions, including curfew, home detention, things of that

24  nature, for Mr. Reynolds to be placed there and monitored by

25  the Probation Department.  Thank you.

1              THE COURT:  Mr. Cronk?

2              MR. CRONK:  Just briefly, I think he's still

3    serving his State sentence.  I don't know how the Court could

4    release him other than to the halfway house, and I understand

5    the halfway house doesn't want him.  I think all that's really

6    inconsequential.  This man is using the internet to chat with

7    minors while housed at a halfway house.  Your Honor doesn't

8    know anything about Brad Reynolds or the situation at his

9    house, whether or not he's willing to give up computer access,

10   because Mr. Reynolds thrives on it, this Mr. Reynolds.

11   There's been nothing done here to overcome the presumption

12   that he poses a danger to the community.  Nothing that they've

13   presented does that.

14             THE COURT:  Well, of course, this is not the

15   trial.  The matter still needs to be presented to the Grand

16   Jury, and I presume the innocence that's set forth on Section

17   3142(j).  Even with the presumption of innocence, I'm not

18   going to release Mr. Reynolds on bond.  I don't know -- I

19   don't know what combination of conditions I could impose that

20   would convince me that Mr. Reynolds would not be a risk of

21   harm or danger to the community.  Obviously I could release

22   him to the halfway house, and that would be very short-lived.

23   We'd be back here again.  I don't know, as Mr. Cronk has

24   pointed out, the situation at Mr. Reynolds' brother's house,

25   but I don't want to send a mixed or inappropriate signal.  I

don't view that as being an appropriate situation.  There is

no proposed third-party custodian.  There is no indication of

what conditions would be, what restrictions could, in fact, be

imposed, but based upon the testimony of Agent McMillan, I'm

satisfied that, as I said, there is no combination of

conditions that I can impose that would ensure Mr. Reynolds is

not a risk of danger to the community.

He will be remanded to the custody of the United

States Marshal pending further order of the Court.  I also

find based upon my reading of the Criminal Complaint, Agent

McMillan's affidavit, and his testimony today that there is

probable cause for the arrest of Mr. Reynolds and the filing

of the criminal complaint.  Mr. Cronk, anything further at

this time?

MR. CRONK:  No, Your Honor.

THE COURT:  Miss Helphrey, anything further on

behalf of Mr. Reynolds at this time?

MS. HELPHREY:  No.  Thank you.

THE COURT:  Thank you.  We'll be in recess

pending the next matter.

MS. HELPHREY:  Actually, Your Honor, I'm sorry.

I forgot one thing.  Could I actually ask the Court to release

the criminal history section to the parties?

THE COURT:  Yes, both counsel may have a copy

of the criminal history section of the Pretrial Services

1    Report.

2                    MR. CRONK:  Thank you, Your Honor.

3                    (The hearing concluded at 1:39 p.m.)

1

2

3

4

5                    CERTIFICATE OF REPORTER

6
        The undersigned, a Certified Shorthand Reporter of the
7   States of Iowa and Illinois, does hereby certify:

8
        That she acted as court reporter in the cause mentioned
9   on the title page of this transcript and transcribed the
    testimony offered and proceedings had on said hearing.
10
        That the foregoing pages of typewritten matter is a full,
11  true, and complete transcript had in this cause and that said
    transcript contains all of the testimony offered and
12  proceedings had at the times herein shown.

13
        DATED this _____ day of August, 2011.
14

15

16

17              _____ /s/ Heidi Krafka _____
                         Heidi Krafka
18              Certified Shorthand Reporter
                Certified in Iowa and Illinois
19

20

21

22

23

24

25

**10** [1] - 5:19
**101** [1] - 1:21
**11** [2] - 5:25, 14:13
**11:00** [1] - 14:17
**11:30** [1] - 15:3
**12** [1] - 5:18
**1217** [1] - 19:7
**13** [3] - 11:7, 12:9, 12:12
**13-year-old** [3] - 10:19, 10:23, 11:3
**131** [2] - 1:13, 1:18
**14** [1] - 2:3
**16** [2] - 2:3
**17** [1] - 2:3
**18** [2] - 2:16, 5:21
**19** [1] - 5:21
**1:11** [1] - 1:12
**1:39** [1] - 24:3
**1st** [2] - 9:7, 9:10
**2004** [4] - 5:9, 5:13, 8:10, 9:3
**2009** [4] - 9:7, 9:10, 9:12, 15:4
**2011** [2] - 1:12, 25:13
**24** [1] - 15:13
**3** [1] - 2:3
**30th** [3] - 9:11, 14:11, 15:4
**3142** [2] - 2:17
**3142(j)** [1] - 22:17
**355-8400** [1] - 1:25
**393** [1] - 1:24
**3:11-MJ-19** [2] - 1:6, 2:14
**401** [1] - 1:21
**5** [1] - 2:15
**5.1** [1] - 2:15
**52722** [1] - 1:25
**52801** [2] - 1:18, 1:21
**563** [1] - 1:25
**6** [1] - 1:12
**7** [1] - 2:3
**9** [2] - 14:13
**abide** [1] - 19:18
**able** [1] - 7:13
**above-entitled** [1] - 1:12
**access** [1] - 22:9
**accessed** [1] - 17:11
**account** [2] - 18:10, 18:12
**acted** [1] - 25:8
**active** [1] - 20:3
**activity** [1] - 17:25
**acts** [3] - 5:11, 5:13, 8:3
**addressed** [1] - 11:20

**adult** [1] - 5:21
**adults** [1] - 11:11
**advised** [1] - 10:9
**affidavit** [6] - 4:18, 4:21, 4:25, 12:1, 13:3, 23:11
**afternoon** [2] - 2:8, 2:10
**age** [3] - 11:7, 11:16, 20:15
**Agent** [6] - 4:13, 6:22, 16:12, 18:17, 23:4, 23:10
**agent** [2] - 3:1, 3:15
**ago** [6] - 8:5, 8:8, 8:11, 8:14, 8:16, 8:25
**allegation** [2] - 20:7, 20:16
**allegations** [8] - 5:15, 5:16, 5:17, 8:2, 9:6, 15:6, 15:16, 20:9, 20:18
**alleged** [14] - 5:13, 8:8, 9:11, 9:14, 10:12, 10:19, 12:5, 13:4, 13:5, 13:21, 14:11, 20:9, 21:18
**allegedly** [1] - 9:20
**allow** [2] - 13:18, 21:14
**allowable** [1] - 6:19
**AMERICA** [1] - 1:4
**America** [2] - 1:19, 2:13
**analysis** [3] - 13:5, 13:20, 13:22
**appear** [2] - 11:14, 20:17, 20:18
**APPEARANCES** [1] - 1:16
**appeared** [1] - 7:14
**appearing** [2] - 1:18, 1:21
**appropriate** [1] - 23:1
**April** [1] - 1:12
**area** [1] - 20:23
**argue** [1] - 6:15
**arm's** [1] - 15:22
**arose** [1] - 5:16
**arrest** [6] - 4:18, 12:16, 12:24, 15:18, 20:1, 23:12
**arrested** [2] - 5:10, 10:6
**assess** [1] - 7:14
**Assistant** [2] - 1:17, 1:20
**Attorney** [1] - 1:17
**Attorney's** [1] - 1:17
**August** [1] - 25:13

**authorizes** [1] - 19:2
**available** [1] - 19:11
**aware** [1] - 19:10
**based** [3] - 19:3, 23:4, 23:10
**basis** [1] - 10:5
**bed** [2] - 7:8, 8:20
**bedtime** [1] - 7:7
**behalf** [2] - 1:21, 23:17
**Bettendorf** [1] - 1:25
**between** [2] - 14:8, 14:13
**bond** [3] - 2:16, 20:16, 22:18
**born** [1] - 20:22
**Box** [1] - 1:24
**Brad** [2] - 19:5, 22:8
**BRIAN** [1] - 1:7
**Brian** [3] - 2:13, 3:24, 7:6
**briefly** [3] - 13:11, 17:21, 22:2
**brother** [3] - 18:25, 19:5, 21:22
**brother's** [2] - 19:20, 22:24
**Bruce** [1] - 21:1
**Building** [2] - 1:13, 1:18
**Bureau** [1] - 3:15
**BY** [9] - 3:10, 4:12, 6:25, 7:24, 13:19, 14:6, 16:11, 16:25, 17:20
**cannot** [1] - 19:4
**case** [4] - 4:19, 9:18, 15:18, 19:24
**Case** [1] - 2:13
**caused** [1] - 7:15
**cell** [3] - 17:10, 17:12, 17:22
**certain** [1] - 18:13
**certainly** [2] - 19:2, 21:6
**CERTIFICATE** [1] - 25:5
**Certified** [3] - 25:6, 25:17, 25:17
**certify** [1] - 25:7
**chair** [1] - 3:8
**chance** [1] - 4:25
**character** [1] - 6:23
**characterize** [1] - 11:13
**characterized** [1] - 11:12
**charge** [1] - 21:7
**charges** [3] - 6:11, 9:5, 20:8

**chat** [4] - 12:9, 14:25, 15:8, 22:6
**chats** [6] - 11:2, 12:12, 15:24, 16:13, 16:14, 16:17
**chose** [1] - 15:21
**circumstances** [1] - 7:15
**clarify** [2] - 7:25, 16:12
**CLERK** [1] - 3:7
**CLIFFORD** [1] - 1:17
**climbed** [2] - 7:8, 8:20
**clothing** [5] - 13:4, 13:6, 13:20, 13:22, 13:24
**Code** [1] - 2:17
**combination** [2] - 22:19, 23:5
**commenced** [1] - 10:1
**commencing** [1] - 9:7
**committed** [1] - 19:14
**commonly** [1] - 21:7
**communicated** [2] - 11:6, 11:18
**communication** [1] - 21:13
**community** [9] - 19:16, 19:21, 20:5, 20:12, 20:21, 21:8, 22:12, 22:21, 23:7
**complaint** [4] - 4:18, 19:15, 20:9, 23:13
**Complaint** [1] - 23:10
**complete** [1] - 25:11
**computer** [13] - 12:1, 12:2, 12:7, 14:16, 14:21, 15:1, 15:9, 16:19, 17:1, 17:8, 17:22, 22:9
**computers** [1] - 17:4
**concerned** [1] - 21:17
**concerning** [2] - 8:2, 8:13
**concluded** [1] - 24:3
**conditions** [5] - 19:19, 21:23, 22:19, 23:3, 23:6
**confirmation** [1] - 19:9
**confirmed** [1] - 19:5
**confiscated** [1] - 17:15
**connected** [1] -

13:23
**connection** [1] - 20:20
**consider** [2] - 19:24, 21:22
**consistent** [3] - 8:24, 8:25, 9:2
**contact** [15] - 9:11, 9:14, 9:20, 10:12, 10:14, 10:20, 10:22, 11:23, 12:6, 13:4, 13:21, 17:22, 17:23, 18:25
**contacts** [3] - 20:13, 20:14, 20:17
**contained** [1] - 4:25
**contains** [1] - 25:11
**content** [2] - 17:21, 18:11
**context** [1] - 12:9
**continue** [1] - 21:15
**continued** [1] - 11:18
**continuing** [1] - 12:13
**contrary** [1] - 16:4
**conversation** [2] - 11:19, 12:13
**conviction** [3] - 6:3, 6:6, 6:16
**convince** [1] - 22:20
**cooperative** [1] - 12:20
**copy** [1] - 23:24
**correct** [16] - 8:3, 8:14, 9:4, 9:8, 9:12, 9:16, 9:21, 10:5, 10:8, 10:12, 10:15, 10:25, 11:3, 12:3, 12:18, 17:24
**counsel** [1] - 23:24
**course** [1] - 22:14
**COURT** [27] - 1:1, 2:8, 2:11, 2:20, 2:23, 3:1, 4:9, 6:7, 6:12, 6:21, 7:21, 13:9, 13:12, 13:17, 14:3, 16:9, 17:18, 18:8, 18:17, 18:20, 19:12, 19:22, 22:1, 22:14, 23:16, 23:19, 23:24
**court** [2] - 2:12, 20:18, 25:8
**Court** [16] - 1:14, 6:10, 19:2, 19:3, 19:10, 19:19, 19:24, 20:6, 20:7, 21:9, 21:17, 21:20, 21:22, 22:3, 23:9, 23:22
**crime** [2] - 5:10, 5:16
**crimes** [1] - 19:14

**criminal** [9] - 1:6, 5:1, 5:7, 20:9, 20:10, 21:5, 23:13, 23:23, 23:25
**Criminal** [2] - 2:15, 23:10
**CRONK** [26] - 1:17, 2:10, 2:19, 2:24, 3:10, 4:7, 4:11, 4:12, 6:10, 6:13, 6:24, 6:25, 7:20, 13:7, 14:4, 14:6, 16:8, 16:23, 16:25, 17:17, 18:7, 18:16, 19:13, 22:2, 23:15, 24:2
**Cronk** [8] - 2:17, 2:23, 14:3, 17:25, 19:12, 22:1, 22:23, 23:13
**cross** [1] - 7:21
**CROSS** [2] - 2:2, 7:23
**CROSS-EXAMINATION** [1] - 7:23
**cross-examine** [1] - 7:21
**CSR** [1] - 1:23
**curfew** [1] - 21:23
**current** [1] - 9:6
**custodian** [1] - 23:2
**custody** [3] - 12:17, 12:21, 23:8
**Dale** [1] - 19:7
**danger** [6] - 19:16, 19:21, 20:5, 22:12, 22:21, 23:7
**date** [1] - 8:7
**DATED** [1] - 25:13
**DAVENPORT** [1] - 1:2
**Davenport** [6] - 1:12, 1:13, 1:17, 1:18, 1:21, 17:9
**days** [2] - 9:15, 15:15
**decision** [1] - 9:4
**defendant** [4] - 4:8, 5:13, 19:14, 19:16
**Defendant** [2] - 1:8, 1:21
**defendant's** [1] - 4:5
**Defender** [1] - 1:20
**Defender's** [1] - 1:21
**delay** [1] - 2:11
**deleted** [5] - 14:22, 15:2, 15:3, 15:5, 15:7
**denied** [2] - 10:14, 11:23
**deny** [1] - 16:13
**Department** [1] - 21:25

**describe** [1] - 5:24
**described** [1] - 8:23
**description** [2] - 7:3, 7:4
**detail** [3] - 7:4, 7:14, 9:1
**details** [4] - 8:17, 8:18, 8:19, 8:25
**DETENTION** [1] - 1:7
**detention** [4] - 2:16, 6:14, 6:20, 21:23
**determine** [1] - 6:8
**determined** [1] - 6:22
**devices** [1] - 17:24
**DIANE** [1] - 1:20
**different** [1] - 17:1
**differentiated** [1] - 16:15
**direct** [1] - 21:12
**DIRECT** [2] - 2:2, 3:9
**directions** [1] - 12:22
**disagree** [1] - 18:3
**discovered** [2] - 5:6, 14:22
**discovery** [2] - 13:7, 18:7
**discussions** [2] - 11:9, 18:4
**dismissed** [1] - 9:5
**disrobed** [1] - 7:8
**DISTRICT** [2] - 1:1, 1:1
**District** [3] - 1:14, 1:17
**DIVISION** [1] - 1:2
**done** [5] - 13:5, 13:20, 14:15, 14:16, 22:11
**down** [1] - 18:18
**duly** [1] - 3:4
**during** [1] - 14:21, 18:9
**East** [2] - 1:13, 1:18
**either** [1] - 5:21
**ejaculated** [1] - 7:12
**employed** [1] - 19:20
**employers** [1] - 17:8
**employment** [2] - 21:4, 21:15
**enforcement** [4] - 3:17, 3:20, 9:15, 15:21
**ensure** [1] - 23:6
**Enterprises** [1] - 21:1
**entirety** [1] - 20:23
**entitled** [1] - 1:12
**entry** [2] - 5:6, 21:6

**environment** [1] - 21:14
**escape** [1] - 13:1
**essentially** [1] - 19:17
**evade** [1] - 13:1
**evaluation** [4] - 11:25, 12:14, 13:23, 16:18
**evidence** [7] - 6:18, 13:14, 13:15, 16:4, 18:5, 19:15
**exact** [2] - 8:6, 11:4
**exactly** [1] - 4:4
**examination** [2] - 14:16, 14:21
**EXAMINATION** [6] - 3:9, 7:23, 14:5, 16:10, 16:24, 17:19
**examine** [1] - 7:21
**examined** [1] - 3:4
**examiners** [1] - 14:22
**execution** [1] - 18:9
**expectation** [1] - 20:21
**experience** [1] - 3:20
**ExpertTire** [1] - 21:3
**expulsion** [1] - 21:20
**extensive** [1] - 19:15
**extreme** [1] - 19:21
**Facebook** [2] - 18:10, 18:12
**fact** [5] - 6:5, 13:14, 20:3, 21:20, 23:3
**failure** [2] - 20:17, 20:18
**fair** [5] - 10:23, 11:7, 11:11, 12:10, 15:11
**familiar** [1] - 3:24
**far** [1] - 6:11
**FBI** [1] - 3:19
**February** [2] - 9:7, 9:10
**Federal** [6] - 1:13, 1:18, 1:20, 2:15, 3:15
**few** [2] - 20:15
**file** [1] - 15:8
**filing** [1] - 23:12
**finger** [1] - 7:9
**first** [2] - 3:4, 20:6
**flight** [1] - 20:5
**Floor** [1] - 1:18
**folder** [1] - 14:22, 14:25
**follow** [1] - 12:22
**follows** [1] - 3:6
**FOR** [1] - 1:1
**foregoing** [1] - 25:10

**forensic** [2] - 14:15, 14:21
**forensics** [4] - 11:25, 12:14, 13:23, 16:18
**forgot** [1] - 23:22
**form** [1] - 20:7
**forth** [2] - 12:21, 22:16
**forward** [1] - 3:2
**foundation** [1] - 6:7
**four** [1] - 15:23
**Fourth** [2] - 1:13, 1:18
**fraud** [1] - 3:22
**front** [1] - 7:10
**full** [1] - 25:10
**generally** [1] - 9:2
**Government** [2] - 2:17, 2:19
**Grand** [1] - 22:15
**great** [1] - 7:4
**Greystone** [1] - 21:2
**guess** [1] - 6:1
**halfway** [12] - 17:10, 19:1, 19:5, 19:18, 19:25, 20:3, 21:10, 21:20, 22:4, 22:5, 22:7, 22:22
**hand** [1] - 7:11
**handcuffed** [1] - 12:21
**harm** [1] - 22:21
**hear** [2] - 6:9, 6:23
**heard** [1] - 13:11
**HEARING** [1] - 1:7
**hearing** [6] - 1:12, 2:14, 2:16, 13:8, 24:3, 25:9
**hearsay** [1] - 6:18
**Heidi** [1] - 1:23, 25:16
**Helphrey** [8] - 2:20, 4:6, 7:21, 16:9, 17:18, 18:20, 19:22, 23:16
**HELPHREY** [18] - 1:20, 2:22, 6:1, 6:15, 7:22, 7:24, 13:10, 13:13, 13:19, 14:1, 16:11, 16:22, 17:20, 18:15, 18:22, 19:23, 23:18, 23:21
**hereby** [1] - 25:7
**herein** [1] - 25:12
**highly** [1] - 19:18
**history** [7] - 5:1, 5:7, 20:10, 20:24, 21:5, 23:23, 23:25
**home** [2] - 19:6, 21:23
**honestly** [1] - 20:21

**Honor** [17] - 2:10, 2:22, 2:24, 6:1, 6:15, 7:20, 16:8, 17:17, 18:7, 18:16, 18:22, 19:15, 19:23, 22:7, 23:15, 23:21, 24:2
**Honorable** [1] - 1:13
**hours** [2] - 14:13, 15:13
**house** [14] - 17:10, 19:1, 19:5, 19:18, 19:25, 20:3, 21:10, 21:20, 22:4, 22:5, 22:7, 22:9, 22:22, 22:24
**housed** [1] - 22:7
**ID** [1] - 14:23
**identification** [1] - 4:10
**identified** [3] - 4:8, 17:4, 17:9
**identifying** [2] - 12:9, 18:12
**III** [1] - 1:17
**Illinois** [2] - 25:7, 25:17
**impose** [2] - 22:19, 23:6
**imposed** [1] - 23:4
**IN** [1] - 1:1
**inappropriate** [1] - 22:25
**incident** [7] - 8:8, 14:8, 14:9, 14:18, 15:7, 15:12
**including** [2] - 15:23, 21:23
**inconsequential** [1] - 22:6
**indicate** [4] - 11:17, 18:25, 20:11, 21:8
**indicated** [6] - 9:25, 11:6, 11:10, 12:1, 12:12, 12:16
**indicating** [3] - 6:3, 14:24, 14:25
**indication** [3] - 6:17, 20:18, 23:2
**indications** [1] - 17:6
**indicia** [1] - 6:19
**individual** [4] - 4:17, 8:2, 10:14, 10:16
**individuals** [1] - 11:10
**information** [3] - 4:24, 18:24, 19:8
**innocence** [2] - 22:16, 22:17
**innocent** [1] - 20:8
**Inspection** [1] - 3:23

**instructions** [1] - 12:23
**intend** [1] - 2:24
**intentionally** [1] - 11:15
**internet** [2] - 17:11, 22:6
**interview** [10] - 5:12, 6:17, 7:1, 8:1, 8:13, 8:24, 10:2, 10:4, 10:11, 11:21
**interviewed** [1] - 6:14
**interviewing** [1] - 8:1
**investigate** [1] - 4:14
**investigating** [2] - 4:14, 18:14
**investigation** [3] - 9:7, 10:1
**Investigation** [1] - 3:16
**investigator** [1] - 3:23
**involve** [1] - 9:7
**involved** [2] - 9:20, 12:3
**IOWA** [1] - 1:1
**Iowa** [8] - 1:13, 1:14, 1:17, 1:18, 1:21, 1:25, 25:7, 25:17
**irrelevant** [1] - 6:16
**jail** [1] - 17:2
**James** [2] - 2:3, 3:13
**JAMES** [1] - 3:3
**January** [3] - 9:11, 14:11, 15:4
**Jim** [1] - 2:24
**judge** [1] - 5:24
**Judge** [2] - 1:13, 18:19
**jumpsuit** [1] - 4:6
**Jury** [1] - 22:16
**kind** [5] - 10:22, 11:18, 11:22, 20:2, 20:16
**knowingly** [1] - 11:6
**Krafka** [2] - 1:23, 25:16
**labeled** [1] - 14:23
**lascivious** [3] - 5:11, 5:13, 8:3
**last** [2] - 3:12, 20:15
**law** [4] - 3:17, 3:20, 9:15, 15:21
**lay** [1] - 6:7
**learned** [1] - 15:12
**least** [1] - 17:8
**leeway** [1] - 13:17
**legal** [1] - 17:7
**less** [1] - 15:15

**liability** [1] - 6:20
**Library** [1] - 17:9
**life** [1] - 20:24
**lived** [1] - 22:22
**lives** [1] - 19:7
**logs** [1] - 14:25
**look** [1] - 9:17
**M-C-M-I-L-L-A-N** [1] - 3:13
**maintained** [1] - 15:1
**man** [2] - 19:20, 22:6
**manner** [2] - 8:22, 8:23
**manually** [1] - 7:11
**Manufacturing** [1] - 21:2
**Marshal** [1] - 23:9
**masturbated** [1] - 7:10
**matter** [10] - 1:12, 2:12, 6:4, 6:20, 8:13, 9:3, 20:19, 22:15, 23:20, 25:10
**McMillan** [9] - 2:3, 2:25, 3:1, 3:3, 3:13, 4:13, 16:12, 18:17, 23:4
**McMillan's** [2] - 6:22, 23:11
**mean** [1] - 18:3
**meaning** [1] - 15:5
**medium** [1] - 18:6
**mentioned** [1] - 25:8
**midnight** [1] - 14:14
**might** [1] - 21:6
**minor** [10] - 5:11, 9:20, 10:12, 11:18, 12:3, 12:4, 12:5, 12:10, 14:23, 17:23
**minors** [7] - 11:23, 15:25, 16:13, 16:14, 16:17, 18:4, 22:7
**minute** [1] - 9:1
**misrepresenting** [1] - 11:16
**Miss** [4] - 4:6, 17:18, 18:20, 23:16
**missing** [1] - 5:5
**mixed** [1] - 22:25
**molested** [1] - 8:21
**monitored** [2] - 20:12, 21:24
**monitoring** [1] - 21:12
**months** [1] - 21:2
**most** [3] - 17:25, 20:25, 21:16
**MR** [25] - 2:10, 2:19, 2:24, 3:10, 4:7, 4:11, 4:12, 6:10, 6:13, 6:24,

6:25, 7:20, 13:7, 14:4, 14:6, 16:8, 16:23, 16:25, 17:17, 18:7, 18:16, 19:13, 22:2, 23:15, 24:2
**MS** [17] - 2:22, 6:1, 6:15, 7:22, 7:24, 13:10, 13:13, 13:19, 14:1, 16:11, 16:22, 17:20, 18:15, 18:22, 19:23, 23:18, 23:21
**Muscatine** [3] - 5:9, 19:7, 20:23
**name** [2] - 3:11, 3:12
**nature** [2] - 21:8, 21:24
**necessarily** [1] - 11:15
**necessary** [1] - 19:9
**needs** [1] - 22:15
**never** [1] - 10:16
**nevertheless** [1] - 6:13
**next** [2] - 4:5, 23:20
**night** [1] - 14:17
**nine** [1] - 3:19
**note** [1] - 21:6
**nothing** [8] - 3:5, 6:2, 11:21, 14:1, 16:22, 18:15, 22:11, 22:12
**notice** [1] - 20:14
**noticed** [1] - 20:15
**number** [2] - 20:13, 20:14
**object** [1] - 6:2
**objection** [2] - 13:7, 18:7
**obviously** [9] - 6:16, 6:18, 13:14, 19:24, 20:5, 21:3, 21:14, 21:19, 22:21
**occasion** [1] - 4:13
**occupation** [1] - 3:14
**occurred** [4] - 9:11, 13:5, 14:12, 15:7
**OF** [3] - 1:1, 1:4, 25:5
**offense** [1] - 5:18
**offered** [2] - 25:9, 25:11
**Office** [2] - 1:17, 1:21
**officer** [1] - 3:18
**officers** [3] - 13:1, 15:19, 15:22
**old** [7] - 5:15, 5:18, 5:19, 5:20, 5:25, 10:18, 12:12
**older** [2] - 11:15, 20:15
**once** [2] - 9:25,

12:17
**one** [5] - 5:6, 17:8, 19:3, 23:22
**online** [2] - 11:2, 15:24
**open** [1] - 2:12
**opportunity** [1] - 5:12
**option** [2] - 19:3, 19:11
**orange** [1] - 4:6
**order** [2] - 21:21, 23:9
**outlined** [2] - 8:17, 20:24
**overcome** [1] - 22:11
**overnight** [1] - 7:7
**overruled** [1] - 18:8
**p.m** [4] - 1:12, 14:13, 15:3, 24:3
**P.O** [1] - 1:24
**page** [1] - 25:9
**pages** [1] - 25:10
**part** [3] - 5:1, 10:1, 12:8
**partially** [1] - 7:8
**participated** [1] - 10:4
**particular** [1] - 15:8
**parties** [1] - 23:23
**party** [3] - 9:10, 9:23, 23:2
**past** [4] - 7:2, 8:6, 8:14, 20:25
**pending** [2] - 23:9, 23:20
**penis** [2] - 7:10, 7:11
**period** [2] - 14:8, 21:3
**person** [10] - 5:12, 5:15, 5:17, 5:24, 7:1, 7:5, 7:6, 10:19, 12:9, 15:11
**pertinent** [1] - 13:16
**phone** [4] - 17:10, 17:12, 17:15, 17:22
**photos** [1] - 12:2
**physically** [1] - 12:24
**pictures** [2] - 12:7, 12:8
**placed** [1] - 21:24
**placement** [6] - 19:11, 20:1, 20:2, 20:3, 21:21, 21:22
**Plaintiff** [1] - 1:5
**point** [9] - 4:3, 6:2, 6:23, 10:2, 14:9, 15:18, 18:13, 20:6, 20:10

**pointed** [1] - 22:24
**police** [3] - 8:17, 15:12, 15:15
**poses** [3] - 19:16, 19:20, 22:12
**possession** [1] - 17:10
**Postal** [1] - 3:23
**preliminary** [1] - 2:14
**present** [1] - 18:23
**presented** [3] - 11:21, 22:13, 22:15
**presently** [1] - 4:15
**presents** [1] - 20:4
**presume** [1] - 22:16
**presumed** [1] - 20:8
**presumption** [2] - 22:11, 22:17
**Pretrial** [7] - 5:1, 19:4, 19:8, 20:25, 21:13, 21:18, 23:25
**primarily** [2] - 21:10, 22:15
**probable** [2] - 19:13, 23:12
**Probation** [1] - 21:25
**probative** [1] - 6:20
**Procedure** [1] - 2:16
**proceed** [2] - 2:18, 2:21
**proceedings** [2] - 25:9, 25:12
**process** [1] - 12:20
**professional** [1] - 21:12
**proffer** [1] - 18:24
**proposed** [1] - 23:2
**prosecute** [1] - 9:4
**provide** [2] - 18:24, 19:7
**provided** [1] - 12:17
**provides** [2] - 21:11, 21:12
**Public** [2] - 1:20, 17:9
**pursuant** [2] - 2:14, 2:16
**pursue** [1] - 9:4
**pursued** [2] - 6:11, 6:18
**quite** [1] - 20:21
**reach** [1] - 15:22
**reading** [1] - 23:10
**ready** [3] - 2:17, 2:19, 2:21
**realistic** [1] - 20:21
**really** [1] - 22:5
**recent** [2] - 17:25, 21:1

**recently** [2] - 8:3, 21:16

**recess** [1] - 23:19

**record** [4] - 2:12, 4:7, 4:9, 6:2

**records** [1] - 9:17

**recross** [2] - 16:9, 16:10

**RECROSS** [2] - 2:2, 17:19

**RECROSS-EXAMINATION** [1] - 17:19

**rECROSS-EXAMINATION** [1] - 16:10

**recross-Ms** [1] - 16:9

**REDIRECT** [3] - 2:2, 14:5, 16:24

**redirect** [1] - 14:3

**reference** [1] - 13:3

**referenced** [1] - 19:9

**referring** [1] - 4:4

**reflect** [2] - 4:7, 4:9

**regard** [13] - 6:8, 8:16, 9:3, 9:6, 9:14, 10:11, 12:8, 13:21, 18:11, 20:4, 20:10, 20:20, 21:5

**regarding** [2] - 6:17, 7:25

**release** [7] - 19:24, 21:9, 21:10, 22:4, 22:18, 22:21, 23:22

**relevant** [2] - 6:14, 13:13

**reliability** [2] - 6:17, 6:21

**reluctant** [1] - 21:21

**remained** [1] - 20:23

**remanded** [1] - 23:8

**Report** [5] - 5:2, 19:4, 20:25, 21:19, 24:1

**report** [4] - 5:7, 19:10, 20:13, 20:14

**reported** [11] - 8:2, 8:9, 8:10, 9:10, 9:15, 9:19, 9:23, 9:25, 15:11, 21:18

**REPORTER** [1] - 25:5

**reporter** [2] - 5:20, 25:8

**Reporter** [2] - 25:6, 25:17

**Reporting** [1] - 1:24

**reporting** [1] - 14:8

**reports** [4] - 8:16, 8:17, 8:20, 21:2

**represented** [2] - 11:11, 12:2

**residence** [2] - 7:7, 21:16

**resist** [2] - 12:24, 15:21

**resistant** [1] - 12:23

**respect** [4] - 11:9, 11:25, 12:16, 17:21

**responded** [1] - 15:15

**response** [1] - 17:7

**restrictions** [1] - 23:3

**resulted** [1] - 21:19

**return** [1] - 21:16

**review** [2] - 4:21, 4:25

**revocation** [1] - 20:2

**Reynolds** [32] - 2:13, 2:21, 3:24, 4:14, 5:25, 7:6, 7:8, 8:20, 9:11, 10:2, 10:20, 12:6, 12:13, 13:24, 15:19, 16:13, 19:1, 19:6, 19:25, 20:4, 20:8, 21:9, 21:15, 21:24, 22:8, 22:10, 22:18, 22:20, 23:6, 23:12, 23:17

**REYNOLDS** [1] - 1:7

**reynolds** [1] - 4:15

**Reynolds'** [6] - 14:16, 15:1, 15:8, 18:25, 20:20, 22:24

**rights** [1] - 10:9

**risk** [4] - 20:5, 21:8, 22:20, 23:7

**RMR** [1] - 1:23

**roughly** [6] - 5:8, 5:25, 7:1, 8:11, 9:14, 15:13

**Rule** [2] - 2:15

**rules** [1] - 17:12

**Rules** [1] - 2:15

**run** [1] - 20:22

**satisfied** [1] - 23:5

**saw** [1] - 12:13

**scientific** [2] - 13:15

**search** [1] - 18:9

**seat** [1] - 3:7

**seated** [2] - 2:8, 4:3

**Second** [1] - 1:21

**section** [2] - 23:23, 23:25

**Section** [2] - 2:17, 22:16

**see** [4] - 4:1, 5:4, 6:5, 21:7

**send** [1] - 22:25

**sentence** [1] - 22:3

**serious** [1] - 19:14

**service** [1] - 17:7

**Service** [1] - 3:23

**Services** [7] - 5:1, 19:4, 19:8, 20:25, 21:13, 21:18, 23:25

**serving** [1] - 22:3

**set** [2] - 19:19, 22:16

**seven** [3] - 8:11, 8:14, 8:16

**sexual** [4] - 11:19, 16:13, 16:17, 17:23

**sexually** [2] - 8:21, 18:4

**sexually-themed** [1] - 18:4

**Shields** [1] - 1:13

**short** [1] - 22:22

**short-lived** [1] - 22:22

**Shorthand** [2] - 25:6, 25:17

**shortly** [2] - 14:17, 15:5

**shown** [1] - 25:12

**signal** [1] - 22:25

**simply** [1] - 20:7

**sitting** [1] - 4:5

**situation** [3] - 22:8, 22:24, 23:1

**six** [2] - 21:2, 21:3

**someone** [3] - 11:14, 11:17, 15:7

**sometime** [1] - 15:5

**somewhat** [1] - 12:23

**sorry** [2] - 2:11, 23:21

**SOUTHERN** [1] - 1:1

**Southern** [1] - 1:14, 1:17

**special** [2] - 3:15, 4:13

**specifically** [2] - 11:20, 16:16

**spell** [1] - 3:11

**spirit** [1] - 11:5

**spoken** [1] - 5:22

**stable** [1] - 21:14

**staff** [2] - 21:12, 21:13

**state** [2] - 3:11, 6:10

**State** [1] - 22:3

**statement** [2] - 11:21, 12:17

**STATES** [2] - 1:1, 1:4

**States** [8] - 1:14, 1:17, 1:18, 2:13, 2:17, 3:23, 23:9, 25:7

**staying** [3] - 7:7, 19:1, 19:19

**steady** [1] - 21:4

**step** [1] - 18:18

**still** [5] - 6:19, 17:6, 18:14, 22:2, 22:15

**stimulate** [1] - 7:11

**Street** [4] - 1:13, 1:18, 1:21, 19:7

**strength** [1] - 13:14

**strong** [1] - 20:24

**successfully** [1] - 19:17

**sufficient** [1] - 7:14

**suggest** [1] - 20:11

**Suite** [1] - 1:21

**support** [1] - 4:18

**surroundings** [1] - 21:11

**survive** [1] - 19:17

**sustained** [1] - 13:9

**swore** [1] - 4:18

**sworn** [2] - 3:2, 3:4

**table** [1] - 4:5

**ten** [1] - 20:15

**terminated** [1] - 20:1

**testified** [1] - 3:6

**testify** [1] - 3:5

**testimony** [8] - 6:9, 6:22, 6:23, 7:25, 23:4, 23:11, 25:9, 25:11

**THE** [30] - 1:1, 1:1, 2:8, 2:11, 2:20, 2:23, 3:1, 3:7, 4:9, 6:7, 6:12, 6:21, 7:21, 13:9, 13:12, 13:17, 14:3, 16:9, 17:18, 18:8, 18:17, 18:19, 18:20, 19:12, 19:22, 22:1, 22:14, 23:16, 23:19, 23:24

**themed** [1] - 18:4

**themselves** [1] - 11:11

**they've** [1] - 22:12

**third** [2] - 9:23, 23:2

**Third** [1] - 1:18

**third-party** [1] - 23:2

**Thomas** [1] - 1:13

**three** [2] - 15:20, 15:21

**thrives** [1] - 22:10

**title** [1] - 25:9

**today** [2] - 4:1, 23:11

**total** [1] - 15:23

**touched** [1] - 7:9

**transcribed** [1] - 25:9

**transcript** [3] - 25:9, 25:11, 25:11

**transpired** [1] - 6:8

**trial** [1] - 22:15

**true** [2] - 4:22, 25:11

**truth** [3] - 3:5

**try** [1] - 13:1

**two** [9] - 3:22, 7:2, 8:5, 8:6, 8:25, 9:15, 14:7, 15:15, 19:14

**two-day** [1] - 14:7

**type** [6] - 6:3, 19:8, 20:4, 20:18, 21:6, 21:19

**typewritten** [1] - 25:10

**U.S** [1] - 1:17

**ultimately** [2] - 7:12, 9:5

**underage** [1] - 11:14

**undersigned** [1] - 25:6

**UNITED** [2] - 1:1, 1:4

**United** [7] - 1:13, 1:17, 1:18, 2:12, 2:16, 3:23, 23:8

**unlikely** [1] - 19:18

**unsupervisable** [1] - 19:17

**unusual** [1] - 14:17

**up** [1] - 22:9

**user** [1] - 14:23

**vagina** [2] - 7:9, 7:10

**versus** [2] - 2:13, 13:15

**viable** [1] - 19:3

**victim** [7] - 6:13, 8:21, 12:4, 13:4, 14:23, 15:6, 15:8

**view** [1] - 23:1

**violation** [1] - 20:16

**violations** [1] - 21:17

**voluntary** [1] - 10:5

**vs** [1] - 1:6

**waiting** [1] - 17:6

**waived** [1] - 10:9

**warrant** [2] - 18:10, 20:17

**warrants** [1] - 4:19

**weapons** [1] - 21:7

**wearing** [3] - 4:4, 4:6, 13:4

**Wednesday** [1] - 1:12

**weeks** [4] - 7:2, 8:5, 8:6, 8:25

**West** [1] - 1:21

**Weston** [1] - 1:24

**whole** [1] - 3:5

**willing** [2] - 19:6, 22:9

**wish** [1] - 18:21

**Witness** [1] - 2:2

**WITNESS** [1] - 18:19

**witness** [3] - 3:4, 3:8, 4:8

**witnesses** [3] - 2:25, 18:20, 18:23

**words** [1] - 15:6

**writer** [1] - 19:8

**Yahoo** [1] - 14:23

**years** [12] - 3:19, 3:22, 5:18, 5:19, 5:25, 8:11, 8:14, 8:16, 11:7, 12:12, 20:15, 21:3