IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :    Criminal No. 3:11-42
                            :
      vs.                   :
                            :
BRIAN EDWARDS REYNOLDS,     :    TRANSCRIPT OF HEARING
                            :
          Defendant.        :
- - - - - - - - - - - - - -X

                         West Floor Courtroom, First Floor
                         United States Courthouse
                         131 East Fourth Street
                         Davenport, Iowa  52801
                         Friday, March 2, 2012
                         1:00 p.m.


BEFORE:  THE HONORABLE ROBERT W. PRATT, Judge.


APPEARANCES:

For the Plaintiff:          CLIFFORD R. CRONK, III, ESQ.
                            Assistant U.S. Attorney
                            U.S. Courthouse, Suite 310
                            131 East Fourth Street
                            Davenport, Iowa  52801


For the Defendant:          DIANE Z. HELPHREY, ESQ.
                            Assistant Federal Public Defender
                            101 West Second Street, Suite 401
                            Davenport, Iowa  52801




                  Terri L. Martin, CSR, RPR, CRR
                   United States Court Reporter
                   Room 189, U.S. Courthouse
                    123 East Walnut Street
                   Des Moines, Iowa  50309

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **For the Defendant:** | | | | |
| Tomas Tovar | 7 | 21 | | |
| James McMillan | 24 | 33 | | |
| | | | | |
| **For the Government:** | | | | |
| Anna Salter | 37 | 43 | 50 | 52 |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1 through 10 - Miranda forms | 22 | 22 |

| DEFENDANT'S EXHIBIT NUMBERS: | | |
|---|---|---|
| A - Advice of Rights form | 32 | 32 |

P R O C E E D I N G S

1

2          (In open court, with defendant present.)

3          THE COURT:  Counsel, are you ready to proceed?

4          MR. CRONK:  The government is ready.

5          MS. HELPHREY:  Yes, Your Honor.

6          THE COURT:  The record should show we're in open

7     court.  There are four motions pending before the court.  The

8     first motion is docket 41.  It's entitled "Defendant's Motion to

9     Suppress Statement and Request for Evidentiary Hearing."

10          Ms. Helphrey, it's your burden.

11          MS. HELPHREY:  I'm sorry, Your Honor.  Could you --

12     I'm sorry, I didn't hear you.

13          THE COURT:  That's all right.  We have the first

14     motion that's pending is Defendant's Motion to Suppress

15     Statement and Request for Evidentiary Hearing.  It's docket 41.

16          MS. HELPHREY:  Thank you, Your Honor.

17          THE COURT:  I believe it's your burden, if you want to

18     proceed.

19          MS. HELPHREY:  Yes, Your Honor.  As I understood it,

20     Detective Tovar and Agent McMillan are both present.  We would

21     initially start with testimony from Detective Tovar.

22          MR. CRONK:  Your Honor, we would like an offer of

23     proof here as to what we would expect to have happen.  The

24     defendant's motion doesn't allege any misconduct on the part of

25     the police.

1          THE COURT:  Yes, I did read the motion.  I don't know.

2     I've never had an offer of proof in this context.

3          MR. CRONK:  Well --

4          THE COURT:  She's got the burden.  I assume she can

5     produce evidence.  Is there some authority for requiring an

6     offer of proof?  I mean, I'm perfectly willing to listen.  I

7     just don't know.

8          MR. CRONK:  No, the only authority I'm aware of is a

9     motion should be putting the parties on notice as to what the

10    factual issues are, and the motion here didn't allege any

11    factual issue.

12         THE COURT:  Well, here is my understanding.  Until we

13    get what I would call the criminal law, construction of, you

14    know, the Iqbal requirement that you've got to do more than

15    conclude, I mean I think -- here is the way I understand your

16    motion.  She claims that the statement is involuntary, that the

17    statements that Mr. Reynolds made are involuntary, and I agree

18    with you that it's rather vague; but I don't know if I can place

19    a requirement on her to plead like I do in civil cases with

20    respect to, you know, rule 8.  You know, they've changed the

21    civil law, as you probably know, in the last three years to

22    require more than a, you know, conclusion.  So I don't know.  If

23    she wants to make an offer of proof, I'm not opposed to that;

24    but I don't know if I have the authority to require her to make

25    an offer of proof.

1          Do you know of any authority?

2          MR. CRONK:  No, Your Honor.  That's not my -- I don't

3   want to repeat myself.

4          THE COURT:  Yes.

5          MR. CRONK:  But my point here is when you file a

6   motion and you allege something, the rules say and the case law

7   suggests that some conclusory vague statement that my rights

8   were violated is not adequate to grant an evidentiary hearing.

9          THE COURT:  Okay.

10          MR. CRONK:  And so --

11          THE COURT:  Well, I think I do have the discretion to

12   overrule it without a hearing.  I thought we would proceed with

13   the hearing.  If she has evidence to support the fact that these

14   statements should be suppressed, fine.  I do note that it's a

15   four-paragraph claim with, as you suggest, no supporting

16   statement; but, again, I don't know -- I just thought that I

17   would use my discretion to see what the evidence is.

18          Ms. Helphrey, do you have -- I assume you have some

19   theory here about what happened so as to make the statements

20   involuntary, some facts that are going to support your claim of

21   involuntariness?

22          MS. HELPHREY:  Your Honor, I can certainly outline

23   where we are going with this.

24          THE COURT:  All right.

25          MS. HELPHREY:  First of all, there are two portions to

1  the motion. One is the voluntariness that we just discussed --

2         THE COURT: Okay.

3         MS. HELPHREY: -- but also whether or not there was a

4  voluntary waiver of Miranda. That was also part of our motion

5  to suppress the statement. And with respect to the

6  voluntariness, that's what we've just discussed, obviously, the

7  police report is what the police report is, and I'm limited to

8  asserting what has been reported by law enforcement. However,

9  the report is not verbatim what occurred in that transaction.

10  Obviously, I've discussed the interview with my client. I don't

11  anticipate my client to testify. I am asking the officer to

12  testify as to what occurred during that interview. Obviously, I

13  expect that there may be portions of that interview that could

14  be delved into that would support the motion. I do not know

15  until the officer takes the stand, obviously, what he's going to

16  say, but I do believe that I need to call the officer to address

17  potential coercive tactics. As I indicated in the motion, there

18  were comments made to Mr. Reynolds about the penalties that he

19  was facing throughout the interview. There was the dynamic of

20  the interview itself in which he was obviously told what he was

21  facing as well as he was going to be taken to court and was

22  unable to leave from those surroundings. As far as the exact

23  circumstances and details, I'm hopeful that the officer will be

24  able to bear out more of that.

25         With regard to the other portion of our challenge to

1  the statement, we are challenging whether or not there was a

2  knowing, voluntary waiver of the Miranda rights that are

3  obviously afforded to Mr. Reynolds should he be in custody.

4  With regard to that, there is a signed form, but obviously the

5  way that that was presented would go into whether or not he

6  knowingly signed the form and waived his rights.

7           So those are the issues we wish to delve into with the

8  officer's testimony.

9           THE COURT:  You can proceed.

10          MS. HELPHREY:  We would ask that Detective Tovar take

11  the stand.

12          THE COURT:  Officer, do you want to raise your hand to

13  be sworn.

14            TOMAS TOVAR, DEFENDANT'S WITNESS, SWORN

15          THE COURT:  Please be seated.

16                      DIRECT EXAMINATION

17  BY MS. HELPHREY:

18  Q.  Sir, could you please state your full name for the record.

19  A.  It's Tomas Tovar.

20  Q.  And could you tell the court what your current position is.

21  A.  I'm a police officer with the City of Muscatine, Iowa.

22  Q.  And how long have you served in that position?

23  A.  For about 20 years now.

24  Q.  Now, with respect to Mr. Reynolds, you're aware of the

25  investigation pertaining to the case we're here on today?

1    A.   Yes.

2    Q.   And as I understand it, you were involved in an interview

3    that took place on March 28, 2011?

4    A.   Yes.

5    Q.   And could you explain briefly what your role was in that

6    interview?

7    A.   I was one of the original investigating officers.  That case

8    started in Muscatine at a municipal level, I guess I'll call it,

9    and it ended up getting picked up by the FBI and investigated by

10   them.  So I knew quite a bit about the case up to that point, so

11   I was assisting Agent McMillan with doing the interview.

12   Q.   And when you indicated you were involved earlier, you

13   described it as in a municipal level.  You investigated it prior

14   to the March 28th interview, is that correct?

15   A.   Yes.

16   Q.   And you were investigating it as part of the Muscatine

17   Police Department?

18   A.   Yes.

19   Q.   And how long ago or how long before this interview did that

20   investigation take place?

21           MR. CRONK:  Your Honor, that's irrelevant.  We're

22   talking about an interview that happened on March 28th of 2011,

23   and nothing about what happened prior to that is relevant to

24   this hearing.

25           THE COURT:  Well, overruled.

1  BY MS. HELPHREY:

2  Q.  How long ago was your involvement in that interview?

3  A.  I think that case started maybe 2008.

4  Q.  And with respect to that case, you were investigating many

5  of the same allegations that were subject of the March 28, 2011

6  interview, is that correct?

7  A.  Yes; some of them.

8  Q.  And with respect to your previous investigation, did you

9  have direct contact with Mr. Reynolds?

10  A.  Yes, I did.

11  Q.  So you had interviewed him before, is that correct?

12  A.  Yeah.  I had spoken to him about this before.

13  Q.  Okay.  So this would have been a second interview with

14  Mr. Reynolds that occurred on March 28, 2011, correct?

15  A.  The first interview was well before that.

16  Q.  Do you remember when that occurred?

17  A.  I think that may have been, like, March of 2008.

18  Q.  With respect to the more recent interview, March 28th of

19  2011, you indicated that you participated in the interview

20  because you had background information on the case, is that

21  correct?

22  A.  Yes.

23  Q.  And that you assisted in the investigation with Agent

24  McMillan, is that correct?

25  A.  Once we turned it over to the FBI, I don't think I did any

1    of the other investigating, other than if he needed to come to

2    Muscatine to talk to someone, I assisted him so he could find

3    who he was looking for faster.

4    Q.   But you assisted with regard to the interview, correct?

5    A.   Yes.

6    Q.   And did you assist also in the arrest of Mr. Reynolds prior

7    to the March 28th interview?

8    A.   Yes.

9    Q.   And with respect to Mr. Reynolds, were you present when he

10   was taken into custody?

11   A.   Yes.

12   Q.   And was he transported to that interview on March 28th in

13   custody?

14   A.   Yes, he was.

15   Q.   Was he in a squad car with handcuffs, and so forth?

16   A.   He was in one of the FBI's vehicles in handcuffs.

17   Q.   And when he was interviewed, what was the location of that

18   interview?

19   A.   At their office in Moline.

20   Q.   You say "their office."  The FBI office or what office?

21   A.   Yes, the FBI office.

22   Q.   And with respect to Mr. Reynolds' arrival at that location,

23   do you recall what happened first when he was taken to that

24   location?

25   A.   The first encounter I had, once they were at the FBI office,

1  he was placed into a conference room.

2  Q.  And when you indicate a conference room, is that a smaller

3  room with a table inside of it?

4  A.  It's an average size room, table, multiple chairs.

5  Q.  And is there anything else located in the room other than

6  the table and chairs?

7  A.  I don't recall for sure what else is in the room.  That's I

8  think the only time I've ever been in that room in their office.

9  Q.  Is there a single door to that room?

10  A.  No.  I believe there's at least two to get in and out.

11  Q.  Now, with respect to his placement in the conference room,

12  at any point between the transport to the office and the

13  interview in the conference room, was there any processing done

14  of Mr. Reynolds?

15  A.  I don't know.

16  Q.  You were not involved in that?

17  A.  No.

18  Q.  When Mr. Reynolds was placed in the interview room, when did

19  you first participate in that contact?  Did you place him there?

20  A.  No, I did not.

21  Q.  When you arrived, who was there?

22  A.  I believe me and my partner at that time, Detective

23  Lawrence, may have gotten to the building just before the agents

24  did, and they arrived with Mr. Reynolds right after we got

25  there.

1 Q. So you were in the conference room when he was brought into

2 that room?

3 A. I think we were waiting outside for someone to bring us in.

4 Q. And did you immediately go into the room when they arrived

5 with Mr. Reynolds?

6 A. I don't know if I went in immediately, but I eventually was

7 in there.

8 Q. Were you there from the start of the interview?

9 A. Yes, I was.

10 Q. Who else was there when the interview commenced?

11 A. Special Agent McMillan.

12 Q. Was there anyone else present besides yourself and Special

13 Agent McMillan?

14 A. No. It was just the three of us in the room.

15 Q. Now, there was a form that was given to Mr. Reynolds during

16 that interview, is that correct?

17 A. I believe so.

18 Q. And that form was entitled "Advice of Rights," is that

19 correct?

20 A. Yes.

21 Q. And with respect to the advice of rights form, that's how

22 it's entitled, is that correct?

23 A. I believe that's what it says on it.

24 Q. And it outlines rights that are relevant to Miranda

25 proceedings, is that correct?

1    A.  Yes, I believe so.

2              MS. HELPHREY:  Your Honor, may I approach the witness?

3              THE COURT:  You may.

4    BY MS. HELPHREY:

5    Q.  Sir, I'm going to give you a form that is marked Defendant's

6    Exhibit A.

7              Is that the advice of rights form that you were

8    speaking of?

9    A.  Yes.

10   Q.  And on that form is your signature, is that correct?

11   A.  Yes, it is.

12   Q.  And above your signature, as well as Agent McMillan's

13   signature, is a line entitled "Sign," and then it has B.

14   Reynolds, is that correct?

15   A.  Actually I think it says Brian Reynolds.

16   Q.  With respect to the signing by Brian Reynolds, were you

17   there when that signature was performed?

18   A.  Yes.

19   Q.  I want to ask you specifically, when was the form presented

20   to Mr. Reynolds?

21   A.  You mean what time?

22   Q.  When in the interview process.

23   A.  At the beginning when we started talking to him in the

24   conference room.

25   Q.  Had there been any conversation with Mr. Reynolds prior to

1  the presentation of this form?

2  A.  I don't believe there was, other than I've known Brian for a

3  while, and I know he was asking questions and, you know, trying

4  to talk to us.

5  Q.  Do you remember what questions he was asking or what he was

6  trying to talk about?

7  A.  I don't recall.

8  Q.  What response was he given when he was trying to ask

9  questions?

10  A.  I believe he was told that we would be getting to that.

11  Q.  When he was asking questions, was he asking what he was

12  there for?

13  A.  I don't recall what he was saying because we basically went

14  into the Miranda and started the interview.

15  Q.  You indicated that you had interviewed him previously a

16  substantial time before this.  I think your estimate was 2008,

17  is that correct?

18  A.  Yeah, I believe so.

19  Q.  And he knew that you had asked him questions about similar

20  events, is that correct?

21  A.  Yes.

22  Q.  Did he know at that time of the interview that he was there

23  to discuss those similar events?

24       MR. CRONK:  Objection, Your Honor.  How could he know

25  what Mr. Reynolds knew?

1    THE COURT:  Sustained.

2  BY MS. HELPHREY:

3  Q.  Was he given information or an indication at that time that

4  he was there to discuss those same events?

5  A.  I don't believe we had said anything to him about those

6  events.  I believe he was told what he was being charged with.

7  Q.  At the onset of your interview with Mr. Reynolds?

8  A.  I think he was told that when he was arrested.

9  Q.  Okay.  And was he told the penalties by officers?

10  A.  I don't believe we discussed the penalty phase in any of

11  that.

12  Q.  At any time was he told he's facing a lot of time, he better

13  cooperate, this is serious, anything of that nature?

14  A.  He was eventually told the seriousness of the crime and what

15  possible penalties were.

16  Q.  And at what juncture in the interview was that statement

17  made?

18  A.  That was when we were just pretty much done and standing up

19  to walk out of the room.

20  Q.  With respect to the form that was presented to Mr. Reynolds

21  with the marking of Defendant's Exhibit A before you, how was

22  that presented to him?

23  A.  Special Agent McMillan read it to him.

24  Q.  And with regard to Special Agent McMillan reading it to him,

25  did he read it word for word to Mr. Reynolds?

1  A.  I don't recall if he read it word for word.  I can say that

2  when I've worked with McMillan before, he has.

3  Q.  Okay.  And do you have a specific recollection as to

4  specifically what was read to Mr. Reynolds?

5  A.  Agent McMillan had this form in front of him and he was

6  reading from this.  Once he was finished, it got slid across the

7  table to Brian for his signature, and then after that it got

8  slid down the table to me to sign as a witness.

9  Q.  After the form was signed, did the interview immediately

10 begin with Mr. Reynolds?

11 A.  Yes, I believe it did.

12 Q.  Do you remember how the interview began?

13 A.  Special Agent McMillan started asking him some questions

14 about, I believe, Internet usage, social networking, telephone

15 usage, things like that.

16 Q.  And were there times during the interview that Mr. Reynolds

17 expressed any unwillingness or hesitation to communicate with

18 the two of you or answer questions?

19 A.  I don't think he was hesitant to speak with us, but he was

20 very cautious in what he was willing to say to us.

21 Q.  And what led you to believe that he was cautious with what

22 he said to you?

23 A.  He denied knowledge of certain things that later on he did

24 admit that, yes, those things had happened.  It seemed to me he

25 was trying to choose -- pick and choose what he wanted to say at

1  the onset of the interview.  After doing a lot of interviews,

2  I've just come to find that's kind of a normal thing when you're

3  trying to protect something or you don't want to give a lot of

4  information.

5  Q.  At any point in the interview did he say, I'm done or take

6  me to my cell, or anything of that nature?

7  A.  I believe towards the end of the interview he was starting

8  to make comments like that.

9  Q.  And what was the response by yourselves, you and Agent

10  McMillan?

11  A.  At the end of the interview, he was, I believe, taken to

12  court.

13  Q.  You indicated that this happened toward the end of the

14  interview.  Do you recall when Mr. Reynolds specifically said,

15  I'm done, take me to my cell, or did he say that?

16  A.  I don't know if that was his exact words.  He said something

17  to that effect.  I know Agent McMillan at that time was

18  explaining some of the penalties for these types of charges, and

19  that's when those kind of comments came out.  Brian commented

20  that he was, you know, glad we saved the taxpayers some money or

21  something like that, like we already convicted him in court and

22  wanted to be taken away.

23  Q.  Did any questioning continue after he first expressed a

24  desire to be done with the interview?

25  A.  I think we were done by then.  Like I said, that was towards

1 the end of the interview, and he was taken to court.

2 Q. With respect to the advice given to him or the information

3 given to him about the penalties that you just alluded to, what

4 exactly was said to him?

5 A. I believe the minimums and maximums for confinement were

6 discussed at that point or told to him. I don't think it was

7 actually a discussion. I think he was just told, this is what

8 you're looking at possibly.

9 Q. Did anyone suggest, either you or Agent McMillan, that you

10 could have influence on that?

11 A. No.

12 Q. Did anyone suggest to him at any time that because of those

13 penalties he should continue to speak with officers?

14 A. I believe early on in the interview it was discussed about

15 honesty and remorsefulness; but at the end of the interview,

16 once the possible penalties were spoken about, like I said,

17 Agent McMillan was already standing up, grabbing his paperwork

18 and we were getting ready to walk out the door to be finished.

19 Q. When you are describing a discussion about remorse and

20 honesty that you just referenced, what specifically happened

21 with regard to that discussion?

22 A. I don't recall exactly what we said, but I normally have the

23 same, I call it a schtick that I do with the interviews, and it

24 usually entails explaining to people that, you know, honesty

25 about what happened, taking responsibility, showing remorse,

1  those are things that judges and prosecutors look at and rely

2  on.  I usually discuss that with people when I'm talking to them

3  so that they, you know, realize that honesty is actually the

4  best policy in most of these instances.

5  Q.  At any point was it expressed to him in that explanation

6  that him talking to officers would have a benefit for him in his

7  case?

8  A.  There were never any deals offered or anything said to him

9  that there would be leniency for any of that.

10  Q.  You indicated that you had known Brian for a number of

11  years, is that correct?

12  A.  Yes.

13  Q.  At any time had you had any kind of professional conflict of

14  interest with Brian?

15        MR. CRONK:  Objection; irrelevant.

16        THE COURT:  Overruled.

17  A.  I don't believe I have a professional conflict of interest

18  with Brian.

19  BY MS. HELPHREY:

20  Q.  Did you ever choose not to be involved in an investigation

21  because of your knowledge of Brian in the past?

22        MR. CRONK:  Utterly irrelevant.

23        THE COURT:  Overruled.

24  A.  I don't believe I've ever declined to be in an investigation

25  with Brian because I know him or because of my knowledge of him.

1  We did decline an investigation because Brian's ex-wife is

2  currently married to a former investigator at the police

3  department, and at that time that investigator was working with

4  our office.  So that was farmed out to the sheriff's department

5  for charges.

6  Q.  Okay.  And that was an investigation from 2004, is that

7  correct?

8  A.  I don't recall what year that was.

9  Q.  Do you recall if it was an investigation involving a

10  Janelle?

11  A.  I believe it was.

12  Q.  Does that same officer still work with the Muscatine Police

13  Department that's married to Brian's ex-wife?

14  A.  No.  He's retired.

15  Q.  And at the time that you participated initially in this

16  investigation -- you said you were investigating it earlier --

17  was he with the police department then?

18  A.  I don't remember when Detective Quinn retired.

19  Q.  Have you had any discussions with him about what's happening

20  in this case?

21        MR. CRONK:  Irrelevant.

22        THE COURT:  Sustained.

23        MS. HELPHREY:  I have nothing else.

24        Thank you.

25        THE COURT:  Any cross-examination, Counsel?

1    MR. CRONK:  Yes.  Thank you.

2    May I approach the witness?

3    THE COURT:  You may.

4                    CROSS-EXAMINATION

5  BY MR. CRONK:

6  Q.  Detective Tovar, is it fair to say that numerous members of

7  the Muscatine Police Department are familiar with Mr. Reynolds?

8  A.  Yes, it is.

9  Q.  Is it fair to say that he's been arrested more than a dozen

10  times?

11  A.  Yes, it would be.

12  Q.  I've handed you documents marked Government's Exhibits 1

13  through 10.

14    Can you tell us what those are?

15  A.  They are the Miranda form that we use at the Muscatine

16  Police Department to advise people of their rights.

17  Q.  Are each of those Miranda forms, 1 through 10, different

18  times that Mr. Reynolds was advised of his Miranda rights?

19  A.  Yes, they are.

20  Q.  By various officers of either Muscatine County or the

21  Muscatine Police Department?

22  A.  Yes.

23    MR. CRONK:  I move to admit Exhibits 1 through 10,

24  please.

25

1              (Government Exhibits 1 through 10

2              were offered in evidence.)

3        MS. HELPHREY:  No objection.

4        THE COURT:  Received.

5              (Government Exhibits 1 through 10

6              were received in evidence.)

7    BY MR. CRONK:

8    Q.  Is it fair to say that each one of those Miranda forms or

9    those forms contain Mr. Reynolds' signature, just like the one

10   the defense showed you a little while ago?

11   A.  Yes.

12   Q.  And they date from sometime -- what's the earliest one?

13   A.  1986.

14   Q.  And the latest one?

15   A.  If you have them in chronological order, the last one we

16   have here is 2002.

17   Q.  Now, you were involved in an investigation of Mr. Reynolds

18   in 2005?

19   A.  Yes.

20   Q.  And that one involved fraud, is that right?

21   A.  Yes.

22   Q.  And he ultimately went to trial and was convicted?

23   A.  Yes.

24   Q.  Went to prison?

25   A.  Yes.

1 Q.  For theft in the first degree?

2 A.  Yes.

3 Q.  And four counts of forgery?

4 A.  Yes.

5 Q.  Detective Tovar, at any time from the beginning of that

6 interview, after Special Agent McMillan read the Miranda form

7 that is Defendant's Exhibit A to Mr. Reynolds, did anyone

8 suggest to him that he should sign the form?

9 A.  No.  No one told him to sign it.

10 Q.  Did anyone threaten him to sign the form?

11 A.  No, they didn't.

12 Q.  Did anyone try to trick him into believing it was something

13 other than a Miranda form?

14 A.  No.

15 Q.  Did anyone take his hand physically and make him sign the

16 form?

17 A.  No.

18 Q.  Did anyone threaten him, hold a gun to him, do anything at

19 all to get him to sign that Miranda form?

20 A.  No.

21 Q.  Do you have any doubt in your mind at all that Mr. Reynolds

22 understands his Miranda rights?

23 A.  Oh, yes, I believe he understands his rights perfectly fine.

24 Q.  And does that include March 28th of 2011 when you were in

25 that room with him and he was read his rights?

1  A.  Yes.

2  Q.  And there was no threat, force, intimidation, coercion or

3  trickery used to get him to sign the form?

4  A.  No, there was not.

5  Q.  During the course of the interview, was he touched in any

6  way, threatened in any way, anything done to him at all to get

7  him to continue to talk?

8  A.  No.

9          MR. CRONK:  I have no other questions.

10          THE COURT:  Any redirect, Counsel?

11          MS. HELPHREY:  No, I have no further questions.

12          THE COURT:  You may step down.

13                          (Witness excused.)

14          THE COURT:  Do you have any further evidence, Counsel?

15          MS. HELPHREY:  Your Honor, I just want to briefly call

16  Agent McMillan.

17          THE COURT:  All right.

18       JAMES MCMILLAN, DEFENDANT'S WITNESS, SWORN

19          THE COURT:  Please be seated.

20                     DIRECT EXAMINATION

21  BY MS. HELPHREY:

22  Q.  Agent McMillan, could you please state your full name for

23  the record.

24  A.  James McMillan, M-C-M-I-L-L-A-N.

25  Q.  And what is your current position?

1   A.   Special Agent with the Federal Bureau of Investigation.

2   Q.   And how long have you held that position?

3   A.   Ten years.

4   Q.   And in that position, you were involved in the interview of

5   Mr. Reynolds in March of 2011, is that correct?

6   A.   Yes.

7   Q.   And with respect to that interview, you're aware of the

8   form, advice of rights, that was used in that interview, is that

9   correct?

10   A.   Yes.

11   Q.   Now, with respect to that form, do you remember how it was

12   presented to Mr. Reynolds?

13   A.   Yes, I do.

14   Q.   Could you please explain that?

15   A.   I had the form in a similar manner to this (indicating). I

16   had it in front of me, and I read it to Mr. Reynolds verbatim.

17   The reason I know it's verbatim is because that's the practice I

18   use with every defendant that I interview after they're taken

19   into custody. So just from top to bottom down the form for each

20   point starting with, before we ask you any questions and

21   continuing on through, I read it verbatim and then presented it

22   to Mr. Reynolds to sign.

23   Q.   And how long did that process take?

24   A.   As long as it would have taken just to read through the

25   form. Maybe 30 seconds, a minute maybe.

1  Q.  And during that process was Mr. Reynolds asking any

2  questions?

3  A.  No.

4  Q.  Was he speaking in any manner?

5  A.  No.

6  Q.  And during that process did he indicate any concerns about

7  what had been read to him?

8  A.  No.

9  Q.  Now, with respect to the signature, you said that you

10  presented it to him, was that across the table that you were

11  seated at at that time?

12  A.  Yes.

13  Q.  And at what stage in the interview did you present that to

14  him for signature?

15  A.  This was before any questioning proceeded.  This was before

16  any interview was conducted, the form was presented to him.

17  Q.  Had he made any comments or discussions prior to the

18  presentation of the interview -- or excuse me, the presentation

19  of the form?

20  A.  With regard to what?

21  Q.  Anything.  Was there any comments, discussion with

22  Mr. Reynolds prior to the advice of rights?

23  A.  I don't recall any discussion.  Before the interview

24  commenced, I had to collect two DNA swabs from Mr. Reynolds and

25  did that prior to the interview.  So we may have exchanged, you

1  know, some words then.

2  Q.  And when you collected the DNA swabs, was that in the

3  interview room that that took place?

4  A.  Yes.

5  Q.  And was that immediately in advance of the review of the

6  advice of rights form?

7  A.  I'm not sure what you mean by "immediately," but it was

8  before.

9  Q.  Once the swab was collected, was there anything else that

10  was done before initiating the interview?

11  A.  Well, when I took the swab from Mr. Reynolds, he was still

12  handcuffed.  We were standing and I swabbed his cheek with the

13  two collection devices, and then he was uncuffed and then seated

14  at the table.

15  Q.  And with regard to the interview, approximately how long did

16  that interview take place?

17  A.  It's hard to say without my notes, but I would say -- I

18  think we arrived at the office at about ten till 10:00, and I

19  think we left shortly after noon, so it would have occurred in

20  between there, you know, minus travel time between the office

21  and the car and things like that.  So in total maybe an

22  hour-and-a-half.  It's hard to say.

23  Q.  And with respect to that period of time that you were

24  involved in the interview, did you inform Mr. Reynolds of

25  potential penalties that he was facing?

1  A.  That was after the interview was basically over.  That was

2  at the very end.

3  Q.  Was there any mention of that prior to the end of the

4  interview?

5  A.  No.

6  Q.  At any time did Mr. Reynolds express an unwillingness to

7  respond to your questions?

8  A.  No.

9  Q.  At any time did he say, I don't want to talk anymore, to

10  remove me from the area, take me to my cell, something of that

11  nature?

12  A.  If he said that, that was at the very end.  That wouldn't

13  have been at any substantive point during the interview.

14  Q.  So during that hour-and-a-half, it was only at the very end

15  that he expressed hesitation about speaking with officers?

16  A.  Yes.

17  Q.  And at the point that he expressed that, was he asked any

18  additional questions?

19  A.  Well, firstly, I don't recall him expressing, you know,

20  that; but if he would have expressed that, that he wanted to

21  terminate the interview, there would have been no questions

22  asked after that.

23  Q.  At the end of the interview, do you recall him wanting --

24  toward the end of the interview, do you at some point recall him

25  saying he wanted to terminate the interview, no matter what

1  words that he used, but that he wanted to terminate the

2  interview?

3  A.  I don't.  I don't recall that.

4  Q.  Do you recall how the interview terminated, why it ended?

5  Were you done with your questioning?  Was it at his request?

6  How did it end?

7  A.  As I recall it, we covered everything that we needed to

8  cover in the interview, and it was done, it had run its course.

9  Q.  And it was at that time then that you informed him of his

10  penalties?

11  A.  Yes.

12  Q.  And what was the purpose of doing that?

13  A.  Well, that could have been as a result of him saying that he

14  wanted to terminate.  I don't remember if he did or not.  But I

15  told him that we were going to go over -- we were going to take

16  him and turn him over to the custody of the Marshals Service and

17  then he would have his initial appearance, and then I advised

18  him what he was looking at with regard to the federal statutes

19  under which he had been indicted and the penalties associated

20  with that indictment.

21  Q.  Did you express that you would have any input on what would

22  happen with the penalties?

23  A.  Absolutely not.

24  Q.  And, again, I'm sorry if I didn't fully understand, but what

25  was your reasoning for explaining to him the penalties he was

1  looking at?

2  A.  Well, it's just -- in the normal course of business, when

3  you arrest somebody, a lot of times they don't understand the

4  federal system and what's going to happen.  So what I'll do is

5  I'll explain that, okay, you're in custody now and we're going

6  to take you later and you're going to appear before a federal

7  judge or before a magistrate and you're going to have your

8  initial appearance, and I want them to understand the charges

9  that they're facing and so oftentimes I'll explain what they're

10  looking at.

11  Q.  So how did you explain it to him?  What did you say he was

12  facing?

13  A.  I explained to him the statutes under which he was charged

14  and the minimum penalties associated with that, with each count.

15  Q.  And at that time there had been no indictment filed,

16  correct?

17  A.  I believe we arrested him pursuant to a complaint.

18  Q.  So what charges did you tell him he was facing and what

19  minimums did you tell him?

20  A.  I don't recall exactly, but I went through the four counts

21  that were proposed, and I think those were the four counts he

22  was eventually indicted on.  I know that we talked about

23  enticement of a minor.  I know we talked about production of

24  child pornography and receipt of child pornography.

25  Q.  Do you remember what you told him his minimum penalty might

1  be?

2  A.   I believe I said that if he ended up being sentenced

3  consecutively on all of the charges, he would be looking at 45

4  years minimum.

5  Q.   And after you expressed that, did he provide any other

6  statement to you?

7  A.   No.  No, I should correct that, Ms. Helphrey.  After he was

8  advised of that, Mr. Reynolds became somewhat agitated and made

9  spontaneous statements to the effect of, well, we sure saved the

10  taxpayers a lot of money with this trial, didn't we?  And he

11  made other statements to the effect of that he was going to drag

12  this out, that he was going to bring the alleged victim into

13  court and see how she held up; but that wasn't the result of any

14  questioning.

15  Q.   And, finally, you indicated that Mr. Reynolds signed the

16  underlying portion of the advice of rights form next to the word

17  "sign," is that correct?

18  A.   Yes.

19  Q.   There are numerous sentences under the rights that are

20  listed in the advice of rights form, is that correct?

21  A.   Yes.

22  Q.   Did you have him acknowledge in any way each individual

23  statement as you went through them?

24  A.   As I've described earlier, I read the form to him verbatim

25  and then provided it to him for his review.  He looked at it.  I

1  can't say if he read it or not, but he examined it for a few

2  seconds and then signed it.

3  Q.  Okay.  But you did not have him initial any of the

4  individual statements, is that correct?

5  A.  No.

6  Q.  Is that your practice to do that or do you typically not do

7  that?

8  A.  Typically we don't do that.  I know a lot of local police

9  departments employ that practice, but that's generally not a

10 practice employed by the FBI.

11 Q.  And by yourself when you're conducting interviews, do you

12 typically employ that method of initialing each of the

13 identified rights?

14 A.  How I did it in this case is how I do it in every case.

15       MS. HELPHREY:  Your Honor, I would also move for

16 admission of the Defendant's Exhibit A, the advice of rights

17 form.

18                         (Defendant's Exhibit A was

19                          offered in evidence.)

20       MR. CRONK:  No objection.

21       THE COURT:  Received.

22                         (Defendant's Exhibit A was

23                          received in evidence.)

24       MS. HELPHREY:  I have nothing else.

25       THE COURT:  Any cross-examination?

1      MR. CRONK:  Just briefly I do.

2                    CROSS-EXAMINATION

3 BY MR. CRONK:

4 Q.  You sat across the table from him, is that right?

5 A.  Yes.

6 Q.  You read this Defendant's Exhibit A, the advice of rights

7 form, verbatim?

8 A.  I did.

9 Q.  And you told him before you could talk to him you have to

10 advise him of his rights; isn't that what you did?

11 A.  Yes.

12 Q.  So before you read him the statement, you told him, I'm

13 going to read this statement to you because we can't talk at all

14 until I've done this, is that right?

15 A.  That's right.

16 Q.  And you read it word for word?

17 A.  Yes, I did.

18 Q.  And after you read it, you handed it to him and you

19 presented it to him to read, and he looked at it for a little

20 bit?

21 A.  Yes.

22 Q.  And you said to him, something to the effect of, you should

23 read this and sign it if you agree to talk to us?

24 A.  That's right.  I told him that we wouldn't be able to

25 conduct an interview without him signing the form.

1  Q.  He said words to the effect of what?

2  A.  Of I don't have a problem with that or no problem, and then

3  he signed it.

4  Q.  After he signed it, he gave it back to you?

5  A.  Yes.

6  Q.  And you took it, and that's when you filled in the top and

7  the bottom where you put "Moline, Illinois, March 28, 2011,

8  10:00 a.m."?

9  A.  That's right.

10  Q.  Did you look at your watch to see if it was 10:00 a.m.?

11  A.  Yes.

12  Q.  And so you recorded the time accurately, according to your

13  watch?

14  A.  Yes.

15  Q.  And after you signed it, you slid it across the table to

16  Detective Tovar?

17  A.  Yes.  Detective Tovar was seated to my left, and I provided

18  it to him and he signed it as a witness.

19  Q.  So you're both on the opposite side of the table as

20  Mr. Reynolds?

21  A.  Yes.

22  Q.  And you would describe this room as roughly eight feet by

23  twelve feet?

24  A.  Approximately.

25  Q.  And the temperature in there was normal?

1  A.  Normal.  It's the same temperature as the remainder of the

2  office.

3  Q.  And the whole time you were in there nobody shouted at

4  Mr. Reynolds?

5  A.  No.

6  Q.  And he didn't shout at you?

7  A.  No.

8  Q.  Nobody raised their voices to one another?

9  A.  No.

10  Q.  You didn't threaten him in any way?

11  A.  No.

12  Q.  You didn't make him any promises if he signs this, something

13  good is going to happen?

14  A.  No.

15  Q.  You didn't tell him, if you don't sign it, something bad is

16  going to happen?

17  A.  No.

18  Q.  You didn't try and trick him and say, well, you know, this

19  isn't really an advice of rights form, I just need you to do it

20  for paperwork reasons, or some other form of trickery to get him

21  to sign the form?

22  A.  No.

23  Q.  Is there any doubt in your mind that Mr. Reynolds knew

24  exactly what his rights were before you asked him any questions?

25  A.  No, none whatsoever.

1  Q.  At any time did he express any concern about waiving his

2  rights?

3  A.  No.

4  Q.  At any time did he express any concern about talking to you

5  without an attorney?

6  A.  No.

7  Q.  Did he have any problem signing the form?

8  A.  No, not at all.

9          MR. CRONK:  No other questions.

10          THE COURT:  Any redirect?

11          MS. HELPHREY:  No thank you.

12          THE COURT:  You may step down.

13          Thank you.

14                              (Witness excused.)

15          THE COURT:  Any further evidence, Counsel?

16          MS. HELPHREY:  No, Your Honor.

17          THE COURT:  Any evidence from the government?

18          MR. CRONK:  No.

19          THE COURT:  We'll consider the matter submitted.

20          I have three other motions in this case.  The next one

21  is --

22          MR. CRONK:  Your Honor, we have evidence on the

23  severance motion and the 404(b) motion.

24          THE COURT:  All right.  I have the severance is 40,

25  404(b) is 39, and then there is your all writs motion on the

1  evidence one, which is 43.  So whatever evidence you have you

2  can present.  Just tell me, do they go to all three of your

3  remaining motions or --

4          MR. CRONK:  They go to the severance motion and the

5  404(b) motion.

6          We call Dr. Anna Salter.

7          THE COURT:  Would you raise your right hand to be

8  sworn.

9          ANNA CAROL SALTER, GOVERNMENT'S WITNESS, SWORN

10         THE COURT:  Please be seated.

11                      DIRECT EXAMINATION

12  BY MR. CRONK:

13  Q.  Would you start by telling us your name and then spell your

14  last name, please.

15  A.  Anna Carol Salter, S-A-L-T-E-R.

16  Q.  And tell us your occupation.

17  A.  I am a psychologist.

18  Q.  Tell us how long you've been a psychologist.

19  A.  Since 1978.

20  Q.  And give us a brief description of your background and

21  experience.

22  A.  Education or training?

23  Q.  Let's start with that, education.

24  A.  Okay.  I have a B.A. in English and philosophy from the

25  University of North Carolina.  I have a master's in child study

1  from Tufts University, and I have a Ph.D. in clinical psychology

2  and public practice from Harvard University.

3  Q.  And tell us the nature of your work.

4  A.  Currently I consult half time to the Department of

5  Corrections in Wisconsin.  I also do civil commitment

6  evaluations for the State of Iowa.  In addition, I train

7  professionals regularly in issues related to child abuse.  I've

8  trained in 50 states and ten countries on child abuse.  And I

9  also on occasion testify in legal cases as an expert witness.  I

10  also testify in the civil commitment evaluations as well.

11  Q.  Are you familiar with the studies and literature concerning

12  sexual predators?

13  A.  Yes.  I am familiar with the literature and have contributed

14  to the literature.  I have three books out on sexual predators.

15  Q.  Can you tell us, are you familiar with, in a general way,

16  the facts of this case?

17  A.  Yes.

18  Q.  There are a number of issues that have been raised about

19  certain evidence and whether or not it is relevant or probative

20  of issues in the case.

21      In this particular case, we have allegations that the

22  defendant in 2009 lured a 13-year-old girl to his vehicle and

23  performed sexual acts on her and had her perform sexual acts on

24  him.  There is an allegation that in -- that happened in 2009.

25  There's an allegation from a niece of the defendant that he

1  sexually molested her when she was 11.

2          Can you tell us how in your view there would be any

3  relationship between the sexual assault on an 11-year-old in

4  2002 and a sexual assault on a 13-year-old in 2009?

5  A.  Well, it goes to motivation.  It indicates or it clarifies

6  motivation.  It indicates that Mr. Reynolds is sexually

7  attracted to this particular age group.  It also -- some of the

8  facts in the case were similar, similar in modus operandi in

9  some way.  In both cases he persuaded the victims to engage in

10  sexual acts, but at some point the victims -- or he tried to

11  persuade.  The 11-year-old was not persuaded and was crying and

12  told him to stop, and then he digitally penetrated her.  So he

13  tried to persuade her at first, telling her that he was going to

14  make her a big girl, and when she did not want to be sexually

15  involved with him, he then told her to stop, pulled her hand

16  away.  He then digitally penetrated her.  So he started with an

17  attempt at persuasion and then moved to force.

18          The length of time in between speaks to the durability

19  of the sexual interest.  One thing we know about a genuine

20  sexual attraction to a particular age group is that it tends to

21  be chronic and stable over time.  In the 2009 case, obviously,

22  the age of the victim is very similar, so it indicates -- as I

23  said, it goes to motivation.

24          In addition, he tried -- he did persuade her to engage

25  in sexual acts, but she did not want him to ejaculate in her

1  mouth and tried to pull away, and at that point he forced her as

2  well.

3  Q.  What can you tell us -- one of the reasons why the defense

4  claims that the 2002 incident should not be admitted isn't just

5  the remoteness of it but the fact that there was a delay in the

6  disclosure of the incident to the police.  Can you explain to

7  the court the nature of disclosure in these types of cases?

8  A.  Delayed disclosure is normative.  I have a number of studies

9  on delayed disclosure, and I cannot find one in which the

10  majority of victims of sexual abuse, of child sexual abuse

11  report it at the time.  Typically about 75 percent engage in

12  some form of delayed reporting.

13       When researchers talk to adult survivors of sexual

14  abuse who were abused as children, as many as a third of them

15  indicate to the researchers that they had never told anybody

16  about this until they told the researcher.  Retrospective

17  studies indicate that only about 10 or 12 -- excuse me, 12 to 18

18  percent of sexual abuse offenses ever go to the authorities.

19  The majority of them are never reported enough to reach

20  authorities.

21  Q.  Let's talk about the fact that between 2009 and 2011 there

22  is evidence that this defendant was using social networking

23  sites to make contact with young women and minors and explain to

24  the court how that's relevant to the fact that we have a victim

25  in 2009 and we also have a victim in 2011, both having a cyber

1  relationship with the defendant prior to producing child

2  pornography.

3  A.  Well, if someone wants to molest -- if someone has a sexual

4  interest in minors and wants to molest them, first of all, you

5  have to have contact with them, you have to meet them, you have

6  to have access to them in some way; and, secondly, you have to

7  develop some kind of relationship with them; and, third, you

8  have to desensitize them or at least many offenders do to sexual

9  topics, sexual words, sexual pictures, and so forth.

10         In this case what ties the 2009 victims, the minors

11  that he attempted to befriend, and the 2011 victim, what ties

12  them all together is the fact that, first of all, media was

13  used, social media was used.  Yes, in one case, the current

14  case, he did know the victim through the fact that she was in

15  this -- knew his daughter, but it moved to e-mails and chats.

16  The other minors involved the same modus operandi.  The ones he

17  befriended and tried to befriend, that was all done through

18  Internet, digital media.  The victim in 2011 was the same thing,

19  he made a friend request and then moved to other media, speaking

20  and texting.

21         Now, in this particular defendant's case, it looks

22  like he moves fairly quickly into the sexual arena.  Some

23  offenders will go for a very long period of time listening to

24  the child's problems, flattering the child.  In this case he did

25  flatter people, but he seemed to move very quickly to sexual

1  contact.  Now, having established some kind of relationship with

2  a minor, an offender has to move it over into the sexual arena.

3  He did this by talking about sex, by asking to send pictures,

4  and so forth.

5          Then he moved to what I believe from the evidence that

6  I've read was his purpose, and that was to both elicit sex,

7  child porn, to get these kids to take pictures of themselves and

8  send them to him and eventually to have sexual contact with

9  them.  We know in one case that he did have sexual contact.  We

10  know in the 2011 case he said that he didn't have a car but he

11  would like to have sexual contact as soon as he could get a car,

12  and I believe he was in some sort of custody, under supervision

13  at that time.

14          And so that's what ties it together.  Motivation ties

15  it together.  Intent ties it together.  The plan ties it

16  together.  Knowledge ties it together.

17  Q.  And the ultimate goal ties it together?

18  A.  The ultimate goal ties it together, which is, if you are

19  attracted to minors, then you want to see pictures of nude

20  minors and you also want to have sexual contact with minors.

21  Those two things appear to be his goal.  In addition, getting a

22  child to take nude pictures of herself is a desensitizing

23  technique that makes the conversation even more sexual and makes

24  it easier to then molest the child.

25          MR. CRONK:  I don't have any other questions, Your

1  Honor.

2         THE COURT:  Any cross-examination?

3         MS. HELPHREY:  Thank you.

4                    CROSS-EXAMINATION

5  BY MS. HELPHREY:

6  Q.  Doctor, you indicated you had a familiarity with the case,

7  is that correct?

8  A.  Yes.  The only familiarity I have with the case is that I

9  read the response and opposition to the motion to sever which

10 gave us some of the basic facts of the case, and I met with

11 Mr. Cronk and we discussed it right before I came in.

12 Q.  Okay.  So the only thing that you've read in regard to the

13 case is the motion that you just referenced?

14 A.  Yes.

15 Q.  You've not read any police reports?

16 A.  I have not read police reports.  I want to add to that.  I

17 was read this morning -- I didn't read it myself, but I was read

18 some of the chats between some of the kids and young women that

19 he talked to on the Internet.

20 Q.  And when you say "some of the chats," what chats were you

21 read or were read to you?

22 A.  I don't remember the names of the chats.  There was a random

23 selection I think of chats to describe how he interacted with

24 kids.

25 Q.  Do you know how many different chats you read or had read to

1  you?

2  A.  I think maybe eight or nine.

3  Q.  With respect to the incident that you testified to in --

4  regarding an incident from 2002, are you familiar with what I'm

5  speaking about?

6  A.  Yes.

7  Q.  What information did you have about that incident, other

8  than the motion that you just described?  Were you given any

9  other summary of that incident?

10  A.  I wasn't given any other summary of the incident.

11  Q.  And what is it that you understand to have happened in that

12  2002 incident?

13  A.  Well, according to the response and opposition to the

14  motion, he and his grandmother and the child were alone

15  together.  The child -- the grandmother went to bed.  He went

16  into the child's bedroom.  The child -- I think he had on

17  shorts.  The child had on a nightgown and underwear.  He got

18  into bed with the child and told her he was going to make her a

19  big girl, and he started, I believe, fondling the child and

20  exposed his penis and asked the child to put her hand on his

21  penis.  She pulled her hand back.  She began crying.  He pulled

22  her pants down and digitally penetrated her, and she did not

23  report this for, I believe, a couple of years.

24  Q.  Okay.  And with regard to that incident, are you aware of

25  what relationship there was between Mr. Reynolds and the alleged

1  victim in that case?

2  A.  She was his niece.

3  Q.  Do you know how often they had contact?

4  A.  No.

5  Q.  Do you know how long they had known each other or spent time

6  together?

7  A.  No.

8  Q.  So you know nothing other than what was alleged to have

9  occurred in that incident?

10  A.  Yes.

11  Q.  And with respect to the 2009 incident, what information do

12  you have about what happened in 2009?

13  A.  I'm aware that he knew the child through his daughter; that

14  he obtained her e-mail address; that he contacted her through

15  e-mail and chat rooms; that he gave her false information about

16  his age, which he later modified to some extent; that he was

17  very complimentary to her; that he sent her several pictures of

18  his penis; that he asked her to send him pictures.  She

19  responded by sending him pictures from her computer that were

20  fully clothed, and he indicated that those weren't the kind of

21  pictures that he was interested in; that he had her send him

22  pictures of herself nude, which she did; that he tried to talk

23  her and ultimately did talk her into meeting him; that initially

24  she made excuses saying that she didn't feel well, and he told

25  her that he could make her feel better.

1       Eventually she did agree to meet with him.  She lived

2  a few blocks from his house.  Apparently she walked over.  She

3  couldn't find the right spot but waited on a corner.  He came by

4  in his girlfriend's white, I think, Thunderbird, a white

5  convertible of some sort, picked her up and then sexually

6  molested her.  He fondled her.  He had her commit fellatio on

7  him.  He had oral sex on her, and then she had taken a

8  flashlight with her and she left, and he caught up with her and

9  said that she left the flashlight.  That's what I understand

10 happened.

11 Q.  Are you aware of how long -- or how much contact there was

12 before this incident with the alleged victim as reported to

13 police?

14 A.  No.

15       THE COURT:  Ms. Helphrey, I've read the motion.

16 BY MS. HELPHREY:

17 Q.  With respect to the Facebook chats, are you aware of when

18 they allegedly occurred?

19 A.  I believe they occurred between the two, between 2009 -

20 2011, but I don't have the exact dates.

21 Q.  And you don't know who they were alleged to have occurred

22 between specifically?

23 A.  Well, I understand that he friended several 13- to

24 17-year-old women and that he tried to friend somewhere around

25 190 and that they were all local.

1  Q.  Now, with respect to your testimony about the connection

2  between the different instances, do the facts that are specific

3  to each incident have any relevance to your evaluation?

4  A.  Certain facts certainly have relevance, others probably

5  don't.

6  Q.  Does how the offense occurred have relevance to you?

7  A.  What do you mean by how?

8  Q.  How the sexual assault was perpetrated, how the people met,

9  what their relationship was, do those things matter?

10 A.  What I think is relevant that ties them together is the

11 modus operandi, the use of electronic media in the 2009 and the

12 cases that he friended.  The fact that he was -- gave false

13 information on his age, he used a similar methodology, he was

14 very complimentary to them, he requested -- he made flattering

15 comments, and so forth, in regards and the motivation, of

16 course, that they both indicate that he has a systematic

17 attraction to underage females.

18           In the case of the third victim, there was no

19 electronic media, so it's not that that part of the methodology

20 was similar because it wasn't.  What was similar was the age of

21 the victim and the motivation.  Therefore, they're all minors,

22 and in the first case and the third case -- by "first," I mean

23 the victim that he's being charged with now and the 2002

24 victims, they were very similar in age, between 11 and 13.

25 Q.  Is it relevant what type of relationship that a -- just

1  specific to the facts that you're talking about, in general when

2  you're evaluating the connectivity between instances, is it

3  relevant what type of relationship the perpetrator would have

4  with the victim?

5  A.  Well, in any -- whenever you are trying to decide if

6  something is related or not, you find a whole bunch of things

7  that may have no bearing that don't tie them together, and then

8  you find things that do tie them together.  And the question is,

9  are the things that do tie them together significant enough?

10 For instance, they may have had different hair color, they may

11 be different weights, they may get different kinds of grades in

12 school.  So there are always things that are not similar and

13 that don't tie them together.  The things that I am testifying

14 on are the things that I think do tie them together and they all

15 have to do with the sexual offenses specifically.

16 Q.  And when you indicate what does tie them together, you spent

17 a lot of time talking about motive, is that correct?

18 A.  Yes.

19 Q.  And with respect to motive, if I understand you correctly,

20 you indicate that the 2002 allegation was motivated by an

21 attraction to a younger person, is that correct?

22 A.  Well, I think when you put all of them together, it

23 becomes --

24 Q.  Well, I'm asking you specifically about the 2002 incident,

25 if you could answer the question.  Does that show a motive of

1  the person being attracted to a younger individual 13 years of

2  age?

3  A.  That suggests it; but to have any kind of diagnosis, for

4  example, of pedophilia, you would need more than one example.

5  Q.  Okay.  And that's what I'm asking.

6  A.  Yes.

7  Q.  So that incident of itself does not suggest a diagnosis of

8  pedophilia, is that correct?

9  A.  It does not prove a diagnosis.  It suggests an interest in

10 underage females, but there are different motivations for

11 molesting, revenge, anger, patriate of women.  So it doesn't

12 rule out other motivations.  You only see the pattern when you

13 see multiple victims.

14 Q.  And when you're talking about motivation, you're looking for

15 a motivation that would suggest a diagnosis of pedophilia,

16 correct?

17 A.  I'm looking for the motor behind the offense.  I'm looking

18 for what is it that would cause someone to molest this child,

19 what is the motivation for this molestation.

20 Q.  And the motivation that you have found in connection with

21 these three offenses or these three separate incidents that you

22 describe is a common motivation of attraction to a young person,

23 is that correct?

24 A.  Well, there's a difference.  Developmentally, the

25 17-year-old is not in the same developmental age span as the 13-

1  and the 11-year-old.  We would call the 13- and the 11-year-old

2  in the pubescent age group, and that would be girls who are just

3  coming into puberty but puberty typically isn't completed.  A

4  17-year-old is postpubescent, so that is different; but the

5  methodology in terms of the digital contacts, and so forth, was

6  similar.

7  Q.  Okay.  And with respect to what you indicated, the age

8  groups, they are distinct in relation to the 2002 incident, the

9  2009 incident versus the 2011 allegations, is that correct?

10  A.  Yes.  The 17-year-old is in a postpubescent group and it's a

11  different developmental age.

12          MS. HELPHREY:  I have nothing further.

13          Thank you, Your Honor.

14          THE COURT:  Mr. Cronk, any further examination?

15          MR. CRONK:  Just briefly.

16                    REDIRECT EXAMINATION

17  BY MR. CRONK:

18  Q.  Would it matter if the 17-year-old victim is an

19  underdeveloped female?

20  A.  Well, actually, yes, it might.

21  Q.  In other words, if she looks similar to a 13-year-old rather

22  than a mature woman?

23  A.  Yes.  In answering that I have to say that the definition of

24  pedophilia, for example, we don't have a separate definition for

25  hebephilia at this point; but the definition of pedophilia,

1  which includes 13 and under, states that they can be exclusive

2  or nonexclusive.  Now, an exclusive is an offender who is only

3  interested in minors, and a nonexclusive is someone who has sex

4  with adults and with children and has a sexual interest in both.

5  So the 17-year-old, if all you know about her is her age, the

6  assumption would be that this may well be someone who is

7  attracted to -- would actually be diagnosed as a pedophile

8  today, is attracted to this 13 and younger group, but is also

9  attracted to adults.  That doesn't change the fact that he's a

10 pedophile.  But if the 17-year-old actually looks like a

11 13-year-old, then it might mean that his attraction was more

12 exclusively to this younger group.

13 Q.  Based on the information you have, you've talked about

14 motivation, the motor.  Can you tell what isn't his motivation?

15 I mean, you talked about revenge.  You talked about -- have you

16 found any evidence of any other motivating factor, other than a

17 deviant arousal to children?

18 A.  I don't see any.  He didn't seem to have any concern or

19 caring about this group.  There are some offenders who claim

20 that, you know, I couldn't talk to adults and she really

21 understood me.  But in the first case it seems like he had sex

22 with this kid, forced her at the end, and that was it.  And this

23 third case, what I call the third case, Janelle in 2002, this

24 child was crying, she didn't want to engage in this.  He appears

25 to have no concern or caring for her.

1          So these kinds of facts tend to rule out other

2    motivations.  It certainly wasn't that he had a close, caring

3    relationship and that somehow it got out of hand or anything

4    like that.  The only thing I see that ties him together is the

5    sexual interest in minors.

6          MR. CRONK:  That's all I have.

7          THE COURT:  Any further exam?

8          MS. HELPHREY:  Just one area.

9                    RECROSS-EXAMINATION

10   BY MS. HELPHREY:

11   Q.  Doctor, your analysis assumes that each of these allegations

12   is factually correct; is that fair to say?

13   A.  Yes.  If none of this happened, then my statements are not

14   relevant.

15         MS. HELPHREY:  I have nothing else.

16         Thank you.

17         THE COURT:  You may step down.

18                              (Witness excused.)

19         THE COURT:  Do you have further evidence, Counsel?

20         MR. CRONK:  I don't think so, Your Honor.

21         THE COURT:  All right.  Ms. Helphrey, do you have any

22   other evidence?

23         MS. HELPHREY:  No.

24         THE COURT:  Do you have any argument on -- I'll

25   consider the 404 motion submitted.

1          I now have document 43 motion for other evidence where

2  you, Mr. Cronk, rely on the all writs law to get the tape from

3  Mr. Neary, Mr. Reynolds' previous lawyer, and I have

4  Ms. Helphrey's resistance.  I'm assuming there's no evidence

5  with regard to that.  And the sever and the 404 motions you've

6  had evidence, so is there any other evidence that either one of

7  you have on any of the motions?

8          MR. CRONK:  No, Your Honor.

9          MS. HELPHREY:  No, Your Honor.

10          THE COURT:  All right.  We'll be in recess.  I'll

11  consider the matter submitted.

12          Mr. Cronk, Ms. Helphrey, this may help -- we can go

13  off the record.

14          (Discussion off the record.)

15          (Proceedings concluded at 2:17 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6          That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12         Dated at Des Moines, Iowa, this 26th day of March,

13   2012.

14

15

16

17                          /s/ Terri L. Martin
                            CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25